IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | |
|---|---|
| In the matter of<br><br>DIOCESE OF DAVENPORT,<br><br>       Debtor. | Chapter 11<br>Case No. 06-02229-lmj11<br>Honorable Lee M. Jackwig |

**DISCLOSURE STATEMENT REGARDING
SECOND AMENDED JOINT PLAN OF REORGANIZATION DATED APRIL 3, 2008**

| |
|---|
| **Ballot Deadline:  April 23, 2008** |

The Diocese of Davenport, an Iowa non-profit corporation and the debtor and debtor in possession in the above captioned Chapter 11 reorganization case (the "Diocese" or the "Debtor"), has prepared this Disclosure Statement ("Disclosure Statement") in connection with the "Second Amended Joint Plan of Reorganization dated April 3, 2008" (the "Plan"). A copy of the Plan is attached as Exhibit "A" to this Disclosure Statement. The Official Committee of Unsecured Creditors is a proponent of the Plan which represents the interests of survivors of clergy sexual abuse and recommends that survivors vote to accept the Plan.

## I.    INTRODUCTION.

### A.    The Filing of the Reorganization Case.

On October 10, 2006 (the "Petition Date"), the Diocese commenced the above-captioned Chapter 11 reorganization case ("Reorganization Case") by filing a voluntary Chapter 11 petition. The Diocese filed the Reorganization Case in response to the financial losses posed by the defense of a claim for sexual abuse by clergy resulting in a $1.53 million jury verdict against the Diocese and the losses expected in other pending sexual abuse litigation. After four days of intense mediation between the Diocese, the Official Committee of Unsecured Creditors (the "Committee") and the Diocese's primary insurance carrier, Travelers, the parties negotiated a settlement of all claims for sexual abuse by clergy arising prior to the Petition Date. The Plan implements that negotiated settlement. The Plan also includes Diocesan non-monetary commitments negotiated by the Committee regarding sexual abuse by clergy and continues the Diocese's institutional response to sexual abuse issues. It also fairly, justly, and equitably compensates the survivors of sexual abuse by clergy or others allegedly acting under the direction or control of the Diocese, some identified and some still unknown and allows the Diocese to continue its Catholic ministry and mission.

1

**B.      Overview of the Global Settlement Among the Tort Claimants, the Unknown Tort Claims Representative, the Committee, the Diocese, the Catholic Entities and the Settling Insurers.**

The Plan provides for a global settlement in the amount of $37 million and the establishment of a Settlement Trust to process and pay the Tort Claims made against the Diocese and the Catholic Entities. The Settlement Trust will be funded with $33.1 million in cash and the transfer of the Diocese's Chancery property, having an appraised value of $3.9 million. The cash payment to the Settlement Trust will be obtained by the Diocese from a $19.5 million settlement payment from the Settling Insurers, a $5.9 million payment by the Catholic Entities, and $7.7 million paid by the Diocese. It is anticipated that the Diocese will borrow $2 million in order to make its payment under the Settlement. All payments are subject to the confirmation of the Plan and approval of the Settlement Agreement by the Bankruptcy Court. The funds will be distributed pursuant to the terms and conditions of the Plan, as more fully described in the Plan and Article VII of this Disclosure Statement.

**C.      Subject Matter Jurisdiction of the Bankruptcy Court.**

Attached hereto (as Exhibit "J") is a copy of the Memorandum of Law in Support of Approval of Disclosure Statement and Confirmation of Second Amended Joint Plan of Reorganization outlining the jurisdictional authority of the Bankruptcy Court pursuant to 28 U.S.C. § 1334(b). The Plan proposes that the Bankruptcy Court take jurisdiction over and approve the settlement of the Tort Claims made against the Diocese and its affiliated parishes, schools and other Catholic organizations located within the territory of the Diocese (as defined in the Plan as the "Catholic Entities"). 28 U.S.C. § 1334(b) provides that the Bankruptcy Court shall have original but not exclusive jurisdiction over all civil proceedings arising under title 11 or arising in or related to cases under title 11. The Eighth Circuit Bankruptcy Appellate Panel for

the Eighth Circuit has interpreted this statute and adopted the "conceivable effect" test to determine when the Bankruptcy Court may exercise its "related to" jurisdiction. *In re Farmland Industries*, 296 B.R. 793, 806 (8th Cir. B.A.P. 2003). Because the Catholic Entities hold potential claims against the Diocese and the Diocese holds potential claims against the Catholic Entities for contribution, subrogation, indemnity or other similar claims resulting from negligent acts by them as concurrent tort feasors being the proximate cause of common liability to the Tort Claimants, the resolution of the Tort Claims and the contribution claims between the Diocese and the Catholic Entities falls within the "related to" jurisdiction of the Bankruptcy Court. Moreover, the continuance of the Diocese's Catholic ministry in Southeast Iowa is contingent upon the continued financial support of the Catholic Entities. Under the Plan, the Bankruptcy Court will exercise its jurisdiction over the Tort Claims against the Catholic Entities and the Settling Insurers. As part of the Plan, the Bankruptcy Court will be asked to approve the global settlement by and among the Diocese, the Catholic Entities, and the Settling Insurers, on one hand, and the Tort Claimants, the Committee, and the Unknown Tort Claim Representative, on the other hand, by exercising its jurisdiction under § 1334(b).

**D.      Channeling Injunction and Settling Insurer Injunctions.**

During settlement negotiations, the Tort Claimants, the Committee and Unknown Claim Representative requested a global settlement with the Diocese, the Catholic Entities and the Settling Insurers in exchange for the Plan provisions for channeling injunctions enjoining prosecution of Tort Claims against the non-debtor Catholic Entities and Settling Insurers and channeling of the Tort Claims to the Settlement Trust for treatment and payment. The Bankruptcy Court's authority to channel and enjoin third party claims against non-debtors is well established under Bankruptcy Code § 105(a). *In re A.H. Robbins Co., Inc.*, 880 F.2d 694 (4th Cir.

1989); *McArthur v. Johns-Manville Corp.*, 837 F.2d 889 (2nd Cir. 1988); *Monarch Life Insurance Co. v. Ropes & Gray*, 65 F.3d 973, 985 (1st Cir. 1995); *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 293 (2nd Cir. 1992). Further, third party channeling injunctions of this type are not prohibited by Bankruptcy Code § 524(e). *A.H. Robbins Co., Inc.*, 880 F.2d at 702; *In re Master Mortgage Investment Fund, Inc.*, 168 B.R. 930, 934-37 (W.D. Mo. 1994); *In re Security Services, Inc.*, 203 B.R. 708, 711-12 (W.D. Mo. 1996); *SEC v. Drexel Burnham Lambert Group, Inc., (In re Drexel Burnham Lambert Group, Inc.)*, 960 F.2d 285, 293 (2d Cir. 1992); *A.H. Robins v. Piccinin (In re A.H. Robins, Inc.)*, 880 F.2d 694, 702 (4th Cir.1986); *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987); *In re Dow Corning Corp.*, 280 F.3d 648, 657 (6th Cir. 2002); *In re Airadigm Communications, Inc.*, 2008 WL 649704 at *13 (7th Cir. March 12, 2008); In re Munford, Inc., 97 F.3d 449, 455 (11th Cir. 1996).[1]

Under the global settlement, the Settling Insurers have agreed to pay the sum of $19.5 million to the Diocese and the Catholic Entities have agreed to pay an additional sum of $5.9 million to the Diocese and sell their Travelers Insurance Policies back to Travelers as additional consideration for these injunctions. The Permanent Injunction Against Prosecution of Channeled Claims set forth in Section 18.4 of the Plan and the Settling Insurer Injunction set forth in Section 18.5 of the Plan are integral to the funding and confirmation of the Plan. Without the Bankruptcy Court's approval of the Settlement Agreement and the issuance of the Permanent Injunction Against Prosecution of Channeled Claims and the Settling Insurer Injunction, neither

---

[1] There is no Eighth Circuit Court of Appeals decision adressing the issue of non-debtor channeling injunctions. Some courts outside of the Eighth Circuit prohibit non-debtor injunctions under 11 U.S.C. § 524(e), specifically the Ninth Circuit and the Tenth Circuit. The reasoning of these cases generally originates in *Underhill v. Royal*, 769 F.2d 1426 (9th Cir. 1985) and *Landsing Div. Props. v. First National Bank & Trust Co. of Tulsa (In re Western Real Estate Fund, Inc.)*, 922 F.2d 592, 601-02 (10th Cir. 1990); *see also Am. Hardwoods, Inc. v. Deutsche Credit Corp. (In re Am. Hardwoods, Inc.)*, 855 F.2d 621 (9th Cir. 1989). If the Bankruptcy Court were to follow the reasoning of the Ninth and Tenth Circuits, the settlement will not occur and the Plan will not be feasible or confirmable.

the Settling Insurers nor the Catholic Entities are obligated to make any of the payments
contemplated in the Settlement Agreement and the funds available for distribution to the Tort
Claimants will be reduced by no less than $25.4 million. Absent the contributions of the Catholic
Entities and Settling Insurers, the Plan will not be feasible and cannot be confirmed and the
result may be the liquidation of the Diocese due to an inability to successfully reorganize. A
copy of the Settlement Agreement is attached hereto as Exhibit "B". Prior to the hearing on
confirmation of the Plan, the Diocese shall file a motion pursuant to Rule 9019 of the Federal
Rules of Bankruptcy Procedure and section 363 of the Bankruptcy Code seeking the entry of the
Order Approving Settlement Agreement. A discussion of the Bankruptcy Court's authority to
confirm the Plan and issue the Permanent Injunction Against Prosecution of Channeled Claims
and the Settling Insurer Injunction for the benefit of the non-debtor Catholic Entities and the
non-debtor Settling Insurers, respectively, is set forth in the Memorandum of Law in Support of
Approval of Disclosure Statement and Confirmation of Joint Plan of Reorganization.

## II.   STATEMENTS REGARDING REPRESENTATIONS.

### A.   Definitions And Plan Supremacy.

Unless this Disclosure Statement expressly states that a term defined in the Plan will have
a different meaning herein, all terms defined in the Plan will have the same meanings when used
in this Disclosure Statement. In addition, unless otherwise stated, terms used in this Disclosure
Statement will have the same meanings as in the Bankruptcy Code or the Federal Rules of
Bankruptcy Procedure. Terms defined in this Disclosure Statement which are also defined in the
Plan or the other sources described above are solely for convenience; and the Debtor does not
intend to change the definitions of those terms from the Plan or from the otherwise applicable
sources. Furthermore, in the event of any inconsistency between the Plan and this Disclosure

Statement, the Plan will control. The Exhibits attached to this Disclosure Statement are incorporated into and are a part of this Disclosure Statement.

### B.   **Limited Representations.**

This Disclosure Statement is submitted in accordance with Bankruptcy Code § 1125 for the purpose of soliciting acceptances of the Plan from holders of certain Claims. It is subject to approval by the Bankruptcy Court as containing information of a kind, and in sufficient detail, which is adequate to enable you to make an informed judgment whether to vote to accept or to reject the Plan. This Disclosure Statement will be used to solicit acceptances of the Plan only after the Bankruptcy Court enters an order approving this Disclosure Statement as containing adequate information.

In determining whether the Plan should be confirmed, the Bankruptcy Court will consider whether the Plan satisfies the requirements of the Bankruptcy Code, including whether it is feasible, and whether it is in the best interests of the holders of Claims. The Bankruptcy Court also will receive and consider a ballot report prepared by the Debtor concerning the tabulated votes for acceptance or rejection of the Plan by parties entitled to vote. Only holders of Allowed Claims that are impaired under the Plan will be allowed to vote to approve or reject the Plan.

THIS DISCLOSURE STATEMENT IS NOT THE PLAN. THIS DISCLOSURE STATEMENT, TOGETHER WITH THE PLAN, WHICH IS ATTACHED HERETO AS EXHIBIT "A", SHOULD BE READ COMPLETELY. FOR THE CONVENIENCE OF CREDITORS, THE PLAN IS SUMMARIZED IN THIS DISCLOSURE STATEMENT, BUT ALL SUMMARIES AND OTHER STATEMENTS REGARDING THE PLAN ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN ITSELF, WHICH IS CONTROLLING IN THE EVENT OF ANY INCONSISTENCY.

The Bankruptcy Court will hold a hearing on confirmation of the Plan. The date and time of the hearing will be fixed by order of the Court and will be noticed to Creditors after the Disclosure Statement is approved. The Confirmation Hearing may be adjourned from time to time without

further written notice.

Information contained in this Disclosure Statement was obtained from knowledgeable personnel at the Diocese or from the books and records of the Diocese. Financial information developed for purposes of this Disclosure Statement was prepared by personnel at the Diocese working with the Debtor's Professionals. Certain materials contained in this Disclosure Statement are taken directly from other, readily accessible documents or are digests of other documents. While every effort has been made to retain the meaning of such documents, you are urged to rely upon the contents of such documents only after a thorough review of the documents themselves.

NO REPRESENTATIONS OR ASSURANCES CONCERNING THE DEBTOR, INCLUDING, WITHOUT LIMITATION, ITS OPERATIONS, THE VALUE OF ITS ASSETS, OR THE FUTURE OPERATIONS OF THE REORGANIZED DEBTOR ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

THIS IS A SOLICITATION BY THE DEBTOR ONLY AND IT IS NOT A SOLICITATION BY THE DEBTOR'S ATTORNEYS OR ANY OTHER PROFESSIONALS EMPLOYED BY THE DEBTOR. THE REPRESENTATIONS MADE HEREIN ARE THOSE OF THE DEBTOR AND NOT OF THE DEBTOR'S ATTORNEYS OR ANY OTHER PROFESSIONAL.

REASONABLE EFFORTS HAVE BEEN MADE TO ACCURATELY PREPARE ALL UNAUDITED FINANCIAL STATEMENTS WHICH MAY BE CONTAINED IN THIS DISCLOSURE STATEMENT FROM THE INFORMATION AVAILABLE TO THE DEBTOR. HOWEVER, AS TO ALL SUCH FINANCIAL STATEMENTS, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED THEREIN IS WITHOUT ERROR.

APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE CERTIFICATION BY THE COURT THAT THIS DISCLOSURE STATEMENT IS WITHOUT INACCURACY.

**C.**    **Voting Procedures.**

If you are the holder of a Claim that is "impaired" under the Plan, it is important that you vote. In that regard, acceptances of the Plan are sought only from those holders of Claims whose

7

Claims are "impaired" by the Plan and who are not deemed to have accepted or rejected the Plan. Specifically, acceptances are solicited only from those Creditors and parties in interest whose legal, equitable, or contractual rights are altered by the Plan or who will not receive under the Plan the full amounts of their Allowed Claims in cash on the Effective Date. Holders of Claims which are not impaired under the Plan are deemed to have accepted the Plan. See Bankruptcy Code § 1126(f). Conversely, acceptances need not be solicited from the holders of Claims who will receive nothing under the Plan because they are deemed to have rejected the Plan. See Bankruptcy Code § 1126(g).

In order for a Class of Claims to vote to accept the Plan, votes representing at least two-thirds in amount and more than one-half in number in that Class must be cast in favor of acceptance of the Plan. As more fully described below, the Debtor is seeking acceptances from holders of Allowed Claims in the following Classes (reserving the right to supplement as to any other impaired Class(es) of Claims, if any):

| Class | Description | Status |
|-------|-------------|--------|
| Class 5 | General Unsecured Claims | Impaired - Entitled To Vote |
| Class 6 | Other Tort and Employee Claims | Impaired - Entitled To Vote |
| Class 7 | Tort Claims | Impaired - Entitled To Vote |

The following Classes of Claims are not impaired under the Plan or are otherwise prohibited by the Bankruptcy Code from voting on the Plan for the reason indicated:

| Class | Description | Status |
|-------|-------------|--------|
| Unclassified | Administrative Claims | Unimpaired - Deemed to Accept |
| Class 1 | Priority Employee Unsecured Claims | Unimpaired - Deemed to Accept |
| Class 2 | Priority Unsecured Claims | Unimpaired - Deemed to Accept |
| Class 3 | Secured Claims | Unimpaired - Deemed to Accept |

Class 4          Unsecured General Convenience Claims   Unimpaired - Deemed to Accept

The specific treatment of each Class under the Plan is set forth in the Plan and is summarized

in Article VII of this Disclosure Statement. Bankruptcy Code § 1129(b) provides that, if the Plan is

rejected by one or more impaired classes of Claims, the Plan nevertheless may be confirmed by the

Bankruptcy Court, if: (i) the Bankruptcy Court determines that the Plan does not discriminate

unfairly and is fair and equitable with respect to the rejecting Class(es) of Claims that are impaired

under the Plan; and (ii) at least one Class of Impaired Claims has voted to accept the Plan.

A VOTE FOR ACCEPTANCE OF THE PLAN BY THOSE HOLDERS OF
CLAIMS WHO ARE ENTITLED TO VOTE IS MOST IMPORTANT. THE
DEBTOR AND THE COMMITTEE RECOMMEND THAT THE HOLDERS
OF ALLOWED CLAIMS VOTE IN FAVOR OF THE PLAN.

Unless otherwise expressly stated, portions of this Disclosure Statement describing the

Diocese have not been subject to a certified audit, but have been prepared from information

compiled by the Diocese from records maintained in the ordinary course of its business. Every

effort has been made to be as accurate as possible in the preparation of this Disclosure Statement.

## III.   <u>OVERVIEW OF THE PLAN.</u>

### A.   <u>General Structure of the Plan.</u>

The Diocese filed the Reorganization Case in order to reorganize its financial affairs

pursuant to a plan of reorganization that will, among other things, compensate the survivors of

sexual abuse by clergy or others associated with the Diocese while allowing the Diocese to

continue its Catholic ministry and mission and its efforts to prevent abuse of children in the

future. The Plan contemplates that, on the Effective Date, the Diocese will transfer to a

Settlement Trust certain assets consisting of Cash, settlement proceeds contributed by Settling

Insurers and Catholic Entities, real property commonly known as the Chancery (if the Chancery is

sold before the Effective Date, the sale proceeds will be transferred to the Settlement Trust) and an

assignment of certain other legal claims against third parties. Allowed Tort Claims will be paid by the Settlement Trust and other Allowed Claims will be paid from operating funds of the Diocese.

"Tort Claims," as used in the Plan, means all Claims arising out of Abuse. "Abuse" means any and all acts or omissions that in any way arise out of, are based upon, or involve actual or alleged sexual conduct or misconduct, sexual abuse or molestation, indecent assault and/or battery, rape, lascivious behavior, undue familiarity, pedophilia, ephebophilia, or sexually-related physical, psychological or emotional harm, or contacts or interactions of a sexual nature between a child and an adult, or a nonconsenting adult and another adult, by a Person for whom the Debtor or any Catholic Entity is or was legally responsible, or for whom the Debtor or any Catholic Entity failed to control, direct, train or supervise, or about whose acts and propensities the Diocese or any Catholic Entities failed to warn, disclose or provide information. A child or nonconsenting adult is abused whether or not this activity involves explicit force, whether or not it involves genital or other physical contact and whether or not there is physical, psychological or emotional harm to the child or nonconsenting adult. This definition shall not constitute a waiver of any statute of limitations or any other defense that would otherwise be available to the Debtor, the Reorganized Debtor, any Catholic Entities, or the Settlement Trustee under applicable law.

## IV.    THE DEBTOR.

### A.    The History of the Diocese.

The Diocese was incorporated in Iowa as a non-profit corporation in 1928. The Diocese operates as a 501(c)(3) charitable corporation. The Diocese serves over 100,000 Roman Catholics and eighty-three (83) Parishes in the Diocese (the "Parishes") located within 22 Southeastern Iowa Counties.

### B.    Organizational Structure Of The Diocese.

10

The Diocese is structured and operates in accordance with Roman Catholic Canon Law. The Bishop of the Diocese is the Most Reverend Martin J. Amos, D.D. Part of the duties of the Bishop and the Diocese are carried out by the offices of the Diocese which consist of: the Office of the Bishop (includes Vicar General, Moderator of the Curia, Chancellor's Office (includes Archives); and the Tribunal. These offices are under the direct supervision of the Bishop. They conduct work of several types: work required by Canon Law; work required by civil law of a non-profit corporation; work that supports the Bishop in his responsibilities to the Catholic people and to their Parishes and Schools in the territory of the Diocese; and work that supports the Bishop in his responsibilities to respond to social issues and concerns. Each of the offices performs specific functions in support of the Bishop's pastoral ministries which include:

• Office of the Bishop: This Office deals with official correspondence of the Bishop; scheduling of appointments with pastors, Parish clergy, Parish staff, and parishioners; pastoral visits to Parishes and Schools, and Confirmations at Parishes; oversight of child protection efforts and initiation and coordination of training of Parish personnel.

• Vicar General: The Vicar General has the executive power over the Diocese which belongs to the Bishop by Canon law, namely the power to place all administrative acts except those, however, that the Bishop has reserved to himself or which require a special mandate of the Bishop by Canon law. The Vicar General in the Diocese is Msgr. John M. Hyland.

• Moderator of the Curia: The Moderator of the Curia, under the authority of the Bishop, is to coordinate those things which pertain to the treatment of administrative affairs and to take care that the other members of the curia properly fulfill the office entrusted to them. The Moderator of the Curia in the Diocese is Msgr. John M. Hyland.

• Chancellor's Office: This office is responsible for facilitation of archival record

keeping; arrangement of priest substitute needs for Parishes. The Chancellor is required by the Canon law to ensure that all documents which regard the Diocese or Parishes must be protected with greatest care. The Chancellor ensures that there is in a safe place a diocesan archive, or record storage area in which instruments and written documents which pertain to the spiritual and temporal affairs of the Diocese are to be safeguarded after being properly filed and diligently secured. The Chancellor of the Diocese is Fr. George McDaniel.

• Chief Financial Officer: The Chief Financial Officer administers the finances and property of the Diocese under the authority of the Bishop in accord with the budget determined by the finance council and, from the income of the Diocese, is to meet expenses which the Bishop or others designated by him have been authorized. The Chief Financial Officer of the Diocese is Charlene Maaske, CPA.

In addition, the Diocese provides, among other things: Tribunal: Assistance with and facilitation of needs of parishioners related to the Sacrament of Marriage.

### C.   Legal Structure of the Diocese and Non-Debtor Related Catholic Entities.

The Diocese was incorporated as an Iowa non-profit corporation on June 9, 1928. While the Catholic Church (including each Diocese and each Parish) is governed by and adheres to Canon Law, the Diocese and each Parish are also organized pursuant to civil laws. Each Parish was incorporated as an Iowa non-profit corporation in the early 20th Century, except those Parishes established later, in which case such Parish was incorporated when it was established. Each Parish is a separate corporate entity apart from the Diocese. The Diocese, Bishop and Vicar General also serve as members of the Board of Directors on most other Catholic Entities related to the Diocese. Although each Parish has its own board of directors and financial records, the Bishop and Vicar General of the Diocese are two of the five members of each Parish board. In

addition, the remaining three members of the Parish board are appointed by the Bishop and are subject to removal by the Bishop, with or without cause at any time. The Bishop also serves as president of each Parish.

During the Reorganization Case, the Committee investigated claims of whether the assets of the Parishes could be included in the Diocese's bankruptcy estate under bankruptcy and applicable non-bankruptcy law and whether the separate legal existence of the Parishes or the hierarchical nature of the Diocese organization could effect the assets available for the Estate. The likelihood of success on such claims is materially impacted by the fact that title of the real property in the Parishes is and has been vested in the parish corporations for many years preceding the sex abuse case and the potential cost and outcome of any such litigation. This is unlike the vesting of the parish real properties in the four other Roman Catholic diocese chapter 11 cases where the parish real properties were vested in the respective dioceses. The Committee's recommendation to accept the Plan includes its assessment of the risks associated with the litigation of these claims. The global settlement memorialized in the Settlement Agreement and Plan resolves all such claims.    The Catholic Entities have approved the Settlement Agreement and the Plan.

**D.**    **The Financial Structure and Operations of the Diocese.**

The operations of the Diocese have been funded through three primary sources: (1)  an appeal for offertory donations collected by the Parishes as provided by Canon Law (the "Annual Appeal"); (2) the income received from its investments; fee income, grants and contributions; and (3) gifts, grants and donations from the public. After making the payments required under the Plan, the Diocese will be left without any significant investment income and will be entirely dependent on the Parishes for the contributions which are raised and collected by the Parishes as the Annual Appeal. It is

estimated after confirmation of the Plan that 72% of the Diocese income will be dependent upon

contributions from the Parishes through the Annual Appeal. If the Parish income was not available to

the Diocese, the Diocese could not continue its operations and Catholic ministry. The entry of the

Permanent Injunction Against Prosecution of Channeled Claims is an integral provision to the Plan.

Without it, the Diocese's primary source of income would be vulnerable to Tort Claims.

The Annual Appeal is used to fund ongoing day-to-day Diocesan operations. The Diocese

also receives grants and donations. Typically these funds are donated with a restricted purpose and

are reflected on the books and records of the Diocese as restricted or endowment funds (also

restricted). If no such restriction exists, those assets are considered to be part of the unrestricted

general assets of the Diocese. The Diocese maintained an account labeled "Kingdom Co." At the

time of the commencement of the case, the Kingdom Co. account had a balance of $9,226,788. The

Debtor's schedules of assets and liabilities disclosed a balance of $4,337,988. The difference, being

$4,888,790, was shown in the Statement of Financial Affairs to be the property of St. Vincent Home

Corporation (in the amount of $4,076,982) and the Catholic Messenger (in the amount of

$811,818). In addition, in 2004, $3,950,565 was withdrawn from the Kingdom Co. account and

transferred to the Newman Center in Iowa City, Iowa and $70,052 was withdrawn and transferred to

St. Mary Parish. The Committee analyzed these accounts and pre-petition transfers and considered

the potential claims to avoid such transfers and include such funds in the Estate. These claims are

being resolved as part of the global settlement and funding of the Plan.

The Diocese provides services to or administers certain insurance and other programs for the

benefit of the Diocese and Catholic Entities. The Diocese acts as the custodian for insurance

premiums and other monies paid by these entities to participate in these programs. The funds

received by the Diocese are not property of the Diocese but are paid to the Diocese as the manager

or administrator of the programs.

Information regarding Diocese historical financial performance is contained in the Audited Financial Statements for fiscal years 2004, 2005 and 2006 which are attached hereto as Exhibit "C and the unaudited internally prepared financial statements for the fiscal year beginning July 1, 2007 which is attached hereto as Exhibit "D.

**E.      The Diocese's Assets And Liabilities.**

Following is a description of certain of the assets and liabilities of the Diocese. This discussion is not inclusive of all assets and liabilities as reflected on Exhibits "C" and "D" for a more comprehensive listing of such assets and liabilities, reference should be made to those Exhibits.

**1.      Assets.**

(a)      Real Property

The Diocese owns certain real property. As of the Petition Date, this real property consisted of the following:  (i) the Chancery offices at 2706 N Gaines St., Davenport, Iowa 52804; (ii) a duplex on 2761 Scott Street, Davenport, Iowa; (iii) a twenty six (26) acre farm located at 3718 Telegraph Road, Davenport, Iowa; (iv) a house located at 803 E. 39th Street, Davenport, Iowa.

The Scott Street, Telegraph Road and E. 39th Street properties have previously been sold and the proceeds are included within the Diocese accounts and will be used to fund the Settlement Trust in accordance with the terms of the Plan. The Diocese still owns the Chancery. The Plan provides that the Chancery or the sale proceeds thereof will be transferred to the Settlement Trust. The appraised value of the Chancery property is $3.9 million.

(b)      Personal Property

(i) Accounts Receivable

These Assets consist of amounts owed to the Diocese. The amount, net of doubtful

accounts, as of December 31, 2007 was $15,174.

(ii)  Insurance Policies

The Diocese is the insured under certain general liability insurance policies which were issued at various times relevant to certain Tort Claims. The known Insurance Companies issuing the Insurance Policies and the effective year(s) for each Insurance Policy are set forth in Exhibit "E" attached hereto.

Each of the Insurance Policies is believed to be an occurrence policy which means that if the act occurred during a policy period, regardless of when the claim is made, then the claim may be covered by the applicable Insurance Policy.

All of the Insurance Companies have been put on notice of the Tort Claims which are known to the Diocese. Each of the Insurance Companies has reserved all rights with respect to whether there is coverage for the Tort Claims at all.

The Travelers Indemnity Company, Inc., Aetna Casualty and Surety Company, United States Fidelity and Guaranty Company, St. Paul Fire and Marine Insurance Company,  and St. Paul Mercury Indemnity Company (collectively refered to in this Disclosure Statement as, "Travelers"), participated in the mediations that ultimately led to an agreement by and among the Diocese, the Committee, the Unknown Tort Claimants Representative and Travelers to effect a full and final settlement, compromise, mutual release, resolution of any and all claims by and between the Diocese and Catholic Entities, on the one hand, and Travelers, on the other, relating to any and all disputes and disagreements between them, and to terminate and release any and all obligations that Travelers has or ever may have in the future with respect to or the Bankruptcy Case, Tort Claims, or the Insurance Policies issued or allegedly issued, known or unknown, to the Diocese or Catholic Entities, and to effect the sale of such Insurance Policies to Travelers

16

free and clear of all liens, claims, encumbrances, and interests. In consideration of the settlement agreement, release, and Insurance Policy buy-backs, Travelers agreed to pay the sum of $19.5 million, subject to certain Bankruptcy Court approvals.

The Debtor, the Committee and the Unknown Tort Claimants Representative separately and cooperatively analyzed the claims against Travelers and support the settlement with Travelers that is memorialized in the Settlement Agreement and Plan. Various factors affect the ultimate amount which may be recovered against a particular Insurance Company, including state law defenses that could be asserted against any Tort Claim, the monetary limits that an Insurance Company will be required to pay for an "occurrence" and the definition of an "occurrence" for purposes of coverage. Disputes about the definition of "occurrence" may include: (i) whether each act of abuse is a separate occurrence; (ii) whether abuse that extended cover multiple policy periods are separate occurrences; and (iii) whether policy exclusion for expected or intended injuries are applicable. In addition, Insurance Companies could assert that the Diocese or Catholic Entities should have disclosed the risk of abuse when it periodically applied for insurance coverage and that the Diocese's and/or Catholic Entities' failure to disclose such risks voids the policy and insurance coverage.

To the extent not previously approved by the Bankruptcy Court, the Insurance Settlements listed in Schedule 13.3 to the Plan which include Travelers, and any other Settlement Agreements providing for Insurance Settlements subsequent to the date hereof, shall be approved upon entry of and as a part of the Confirmation Order. All of the Settling Insurers listed in Schedule 13.3 have entered into a Settlement Agreement in consideration of Confirmation of the Plan and Settling Insurer Injunction and will pay the consideration set forth in the Settlement Agreement to or for the benefit of the Debtor, the Estate and the Settlement Trust as provided

therein. On or before the Effective Date, the Debtor and the Catholic Entities, in accordance with the terms of the Settlement Agreement and orders approving such Settlement Agreement, shall release all claims to coverage under the Insurance Policies covered by the Settlement Agreements in consideration of entry of the Settling Insurer Injunction. If a new Insurance Settlement is reached with any Insurance Company after the Effective Date, such settlement will be subject to approval by the Bankruptcy Court pursuant to its retained jurisdiction. A Settling Insurer will obtain the benefit of the Settling Insurer Injunction pursuant to the Plan regardless of whether the Insurance Company becomes a Settling Insurer before or after the Effective Date.

(c)    Restricted Assets

As a non-profit religious organization, the Diocese is the recipient of grants, gifts and other donations which are subject to restrictions imposed by the donor or the grantor. These restricted assets are not property of the Estate nor are they available for distribution to Creditors and will be retained by the Reorganized Debtor. There are various assets which the Diocese lists on its financial statements as being restricted in the amount of $2,540,814.00. There are no Diocese self-imposed restricted assets listed under restricted assets. The restricted assets are listed on Exhibit "F" attached hereto. Under the Plan, the Diocese will retain these restricted assets.

(d)    Avoidance Actions

Pursuant to Bankruptcy Code § 547, a debtor can recover certain payments made to creditors within ninety (90) days of the Petition Date or within one (1) year if the payment is made to an insider (as defined in the Bankruptcy Code). Not all such payments are subject to being paid back to the Estate and various defenses are available to creditors against whom such claims are made. As of the date of this Disclosure Statement, the Diocese does not believe that any of the payments made by the Diocese within either of the two periods provided in

Bankruptcy Code § 547 are recoverable.

As noted above, the Diocese alleged that certain assets in the Kingdom Co. account and certain transfers were not property of the Estate and not included in the Reorganization Case. The Committee participated in the mediation on the assumption that the funds in the Kingdom Co. account were property of the Diocese and could be included as property of the Estate and/or avoided for the benefit of unsecured creditors either as fraudulent conveyances or preferential transfers. The Committee believes that the fair settlement value of any litigation to recover such assets and transfers of Kingdom Co. is included in the settlement that serves as the basis for the Plan. In addition, the Settlement Trust will succeed to the rights of the Diocese to recover fraudulent conveyances and preferential transfers and that any such recoveries will be for the benefit of the Settlement Trust. Under the Plan, all entities that are listed in the Official Catholic Directory under the Diocese's heading that received prepetition transfers and Settling Insurers are released from any liability for such transfers.

(e)    Assets of Non-Debtor Catholic Entities

In two other recent Diocese bankruptcy cases in Portland and Spokane, there was extensive litigation under Bankruptcy Code § 541 as to whether their parishes' assets were part of the bankruptcy estate. Although the Diocese believes that under Iowa and Canon law that Parish assets are not part of its Bankruptcy Estate, this legal issue is unresolved and open to interpretation by the Courts.

In the Portland case, approximately $20 million was spent on legal fees payable by the bankruptcy estate relating to litigation over the estate's assets; in Spokane, approximately $10 million was paid by the estate in legal fees relating to litigation concerning the bankruptcy estate's assets. While the Diocese believes that the assets of the non-debtor Catholic Entities

19

does not constitute property of the Estate, there is no assurance that litigation involving these questions would not consume the assets of the Bankruptcy Estate which otherwise would be available for distribution to the Tort Claimants; nor is there any assurance as to the outcome of any such litigation given the legal structure of the Parishes and the legal control of the Diocese over such Parishes. All such claims are resolved through the Plan and Settlement Agreement.

**2.**    **Liabilities.**

(a)    Trade Debt

The Diocese has incurred certain trade debt in the ordinary course of business. As of the Petition Date, the Diocese had outstanding unpaid trade debt of $9,013.48. As of February 29, 2008, the Diocese had outstanding postpetition trade debt in the amount of $150,143.

(b)    Tort Claims

As is discussed in more detail below, the Diocese is a party to a number of lawsuits or other claims wherein the claimants were abused by clergy or others associated with the Diocese and Catholic Entities. The Diocese and Catholic Entities are liable because they failed to properly supervise these individuals and because they knew or should have known about the actions of these individuals. In order to determine the universe of Tort Claims which might be asserted against the Diocese and as provided under the Bankruptcy Code, a Bar Date was set by the Bankruptcy Court for July 16, 2007.

The time to file Claims has now expired and the universe of Tort Claims (excluding any Unknown Tort Claims) is a total of 162 filed Tort Claims (six of which were filed late).

The Diocese believes that there may be other potential Tort Claimants who are or were minors or who have not discovered a causal relationship between the abuse and the injury, for whom the statute of limitations might be tolled under Iowa law ("Unknown Tort Claims").

20

These Unknown Tort Claimants hold claims that satisfy the definition of "claim" under the Bankruptcy Code and are addressed and treated under the Plan. The Bankruptcy Code has the "broadest possible definition" of a claim which is designed to ensure that "all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case." *California Dept. Health Services v. Jensen (In re Jensen)*, 995F.2d 925, 929 (9th Cir. 1993) (quoting from H.R. Rep. no. 595, 95th Cong. 2nd Sess. 1, 309 (1978)). The focus in determining whether the claim exists is on the debtor's pre-confirmation conduct and a determination as to whether a relationship existed pre-confirmation between an identifiable claimant or group of claimants and the debtor's pre-confirmation conduct. *Epstein v. Committee of Unsecured Creditors (In re Piper Aircraft)*, 58 F.3d 1573 (11th Cir. 1995).

In this case, all of the Tort Claimants, regardless of whether they have discovered a causal relationship between the abuse and their injury, or they are minors, necessarily had a relationship and contact with a Perpetrator who was serving in the Diocese at the time the alleged Abuse. As such, all of the Tort Claimants, including Unknown Tort Claimants, have an identifiable relationship with the Diocese which gives rise to the Claims. Accordingly, all of the Tort Claims are addressed and treated as part of the Plan.

The Diocese requested, and the Court has appointed, an Unknown Claims Representative to represent the interests of the Unknown Tort Claimants in the Reorganization Case.

### F.     The Sex Abuse Crisis.

Over the last fifty years a tragedy that runs contrary to the every teaching of the Roman Catholic Church has unfolded in the church as a whole and in this Diocese in particular; a number of priests, other clergy and other persons took advantage of their positions of trust and respect and sexually abused children. Lawsuits were filed because of the acts of abuse committed

within the Diocese. Most of these claims were made by adults based upon acts that occurred between 1940 and 1985. Although, generally, the Iowa statute of limitations for bringing a civil suit is two years from the date of the act, Iowa law allows some sex abuse claims to be filed later, and, in some cases, many decades later.

### 1.    The 2004 Settlement.

The first round of cases were filed in 2002-3. At that time, the Diocese was a defendant in numerous suits involving plaintiffs and also was in meditation with several others. There were 37 claimants at that time. In addition, the Diocese was providing counseling and other services to individuals who had not sought damages through civil lawsuits. In November 2004, the Diocese and 36 individuals entered into a settlement (the "2004 Settlement"). As part of the 2004 Settlement, the Diocese and the individuals settled 36 claims for $9,000,000. Subsequent to the 2004 Settlement the Diocese has settled 9 additional claims for $1,653,000.

### 2.    The Current Cases.

Since the 2004 Settlement and settlements thereafter, another twenty-five (25) claims were made before the bankruptcy petition was filed.

In addition, the Diocese's Vicar General and Victim Assistance Coordinator had been contacted by other survivors who had not yet filed lawsuits or ask for mediation. One case was tried in September, 2006 and a jury in Scott County, Iowa awarded damages to the victim in the amount of $1,536,000.

The purpose of this Reorganization Case is to enable the Diocese and Catholic Entities to pay fair and just compensation to all survivors of Abuse regardless of when they discovered the causal relationship between the Abuse and their injury and to allow the Diocese to continue its Catholic ministry and services to its Parishes and Schools.

**G.    Connection of the Diocese and the Bishop to the Non-Debtor Catholic Entities**

Each Parish and most School corporations within the territory of the Diocese have the Bishop as one of its directors and its president. The Bishop has no personal proprietary or financial interest in these corporations. However, under Canon and civil law, the Bishop's authority includes the power to remove and replace the board of directors and to appoint clergy. The Diocese contends that it has no legal relationship (as opposed to a religious relationship) with any Catholic Entity, however, the Iowa District Court found that the Diocese had a legal duty to supervise clergy assigned by it under agency law theory.

The Diocese alleges that under Iowa law, the role of civil courts in resolving church property ownership is subject to decisions construing the impact of the free exercise and establishment clauses of the First Amendment of the Federal Constitution. *Fonken v. Community Church of Kamrar*, 339 N.W.2d 810, 812 (Iowa 1983). The Iowa Supreme Court has authorized two approaches to determining ownership of church property: (1) compulsory deference to the decision of the highest authority in a hierarchical church; or (2) application of neutral principals of property law. *Watson v. Jones*, 80 U.S. 679 (1871); *Jones v. Wolf*, 443 U.S. 595 (1979). There are no reported Iowa cases which determine ownership of Catholic church property in Iowa under either approach. The Diocese believes that the assets of the Catholic Entities do not constitute property of the Estate within the meaning of Bankruptcy Code § 541. However, the Diocese also recognizes that lengthy and costly litigation occurred in other Diocese bankruptcy cases involving that precise issue. In addition, the outcome of such litigation is uncertain given the legal structure of the Parishes and the control of the Diocese of the Parishes.

The Committee investigated the legal and financial relationship between the Bishop, the Diocese and the Catholic Entities. The Committee believed that it could assert bona fide claims

23

that the Bishop and the Diocese exerted sufficient authority over the Catholic Entities, their

boards of directors and the individual members of the boards that would allow the Catholic

Entities' assets to be included in the Diocese's bankruptcy estate under Bankruptcy Code § 541.

The likelihood of success of such a claim is extremely difficult to determine and, based on the

precedent of the four other Catholic diocese Chapter 11 cases, would be extremely time

consuming and costly. The litigation would include complex constitutional issues related to the

First Amendment regarding freedom of religion and separation of church and state, and an

intensive factual review of the historical relationship between the bishops of the Diocese and

each Catholic Entity. The Committee's counsel was aware of the complexity of these issues and

the risks of such litigation as it has served as counsel to committees in two of the four other

Catholic diocesan Chapter 11 cases and has considered this type of litigation in both cases. All

such claims are settled and resolved under the Settlement Agreement and Plan.

**H.**      **Contribution Claims.**

Subject to Section 11.15 and Section 13.7, on the Effective Date, the Plan and

Confirmation Order shall effectuate the settlement and compromise of all Tort Claims, including,

without limitation, Unknown Tort Claims, against any and all Catholic Entities. In exchange for

the consideration given by the Catholic Entities under the Plan, including, without limitation,

payments to the Diocese for its payment to the Settlement Trust and the sale and release of

Travelers Insurance Policies back to Travelers, the Catholic Entities shall be deemed Settling

Parties entitled to all of the benefits and protections under the Plan, including, without limitation,

the Permanent Injunction Against Prosecution of Channeled Claims.

In further consideration of the settlement made herein, and subject to the Insurance

Company Defenses and Section 13.7, on the Effective Date the Catholic Entities shall be deemed

to have assigned and transferred to the Reorganized Debtor all of the Catholic Entities' right, title and interest in and to the proceeds of all Contribution Actions and Insurance Claims of every kind and nature which they may hold and all rights to payment under any Insurance Policy issued or allegedly issued by any Non-Settling Insurer, including any claims or causes of action for breach of contract; wrongful denial of coverage; failure to defend or indemnify or settle relating to any Tort Claim, including, without limitation, Unknown Tort Claims; and all proceeds or rights to receive payment from any Non-Settling Insurer, whether or not the Debtor or the Reorganized Debtor was an insured party under any such Insurance Policy issued or allegedly issued by a Non-Settling Insurer. Subject to the Insurance Company Defenses, the Reorganized Debtor will succeed to the Debtor's and the Catholic Entities' right to receive the proceeds or payments from claims and rights of every kind or nature against the Non-Settling Insurers, including the right to receive the proceeds from any and all Insurance Recoveries from Non-Settling Insurers. Except as provided in Insurance Settlements with Settling Insurers rights to proceeds and payments shall inure solely to the benefit of the Reorganized Debtor without any obligation whatsoever for the Reorganized Debtor to pay, reimburse, surrender or disgorge any such Insurance Recoveries to any other Person, including, without limitation, the Tort Claimants or the Settlement Trust, and the Reorganized Debtor shall retain any such proceeds and payments from the Insurance Recoveries for its own benefit and account; provided, however, the proceeds and payments with respect to any Diocese Insurance Policy, or any settlement proceeds with respect to any Diocese Insurance Policy, shall be paid and delivered to the Settlement Trustee upon receipt. The Reorganized Debtor shall provide prompt written notice to the Settlement Trustee of any demands against a Non-Settling Insurer and of any proceeding to enforce claims against a Non-Settling Insurer relating to a Diocese Insurance Policy.

There is a risk that any tender to date of any Tort Claims in connection with any Catholic Entity (including Sacred Heart Cathedral) may be invalid and/or ineffective under State law because the proof of claim forms submitted by the Tort Claimants do not state whether the Claim is against the Debtor, a Catholic Entity (including Sacred Heart Cathedral), the Perpetrator or other Non-Debtor, or some combination of the foregoing, and because, to date, proof of claim forms have been tendered by Debtor's counsel. Any risk relating to any invalid and/or ineffective tender is solely upon the Reorganized Debtor, shall be bourne solely by the Reorganized Debtor and shall not effect the Settlement Trust or the distributions intended to be made thereunder to Tort Claimants.

## V.    SIGNIFICANT EVENTS PRIOR TO THE REORGANIZATION CASE.

### A.    The Response to Childhood Sexual Abuse Crisis.

The Diocese's responded to the sexual abuse issues by: (1) providing and offering mental health counseling to the survivors of sexual abuse; (2) reforming Diocesan operations to provide improved transparency regarding historic and present abuse; and (3) reforming Diocesan operations to prevent future abuse from occurring and to appropriately respond to future abuse reports.

Examples of steps taken by the Diocese include having:

- Formed the victim assistance program through the Diocese Victim Assistance Coordinator ("VAC") so that an abuse victim who is seeking assistance will receive appropriate care through a process that respects that person's dignity. When a person calls the VAC, if the priest is alive, a report is immediately made both to law enforcement and to the Diocese so that the report can be immediately investigated. Without waiting for any results, the VAC may provide counseling services.

- Published the names of all priests against whom there are credible reports of sexual misconduct or abuse involving children and updates this list when new reports arise.

- Entered into an agreement with the Scott County Attorney under which the Diocese reports and directs members of clergy and Diocesan employees to report all reports of sexual abuse of minors it receives or of which it becomes aware against living persons to the Scott County Attorney's office so that it can initiate an investigation and response.

- Participated in annual Compliance Audits by The Gavin Group of Boston, an independent compliance auditing firm, regarding the Diocese's implementation of policies and procedures for the response to reports of sexual abuse of minors, for the creation of safe environment programs, and for pastoral response and outreach to survivors.

- Established the Review Board, which reviews all policies and procedures related to child abuse (reporting, prevention, response to survivors), makes recommendations on how to strengthen policies and procedures. The Review Board is responsible for the review of all allegations of child abuse and sexual misconduct made against clergy.

- Implemented the Safe Environment Program that includes training sessions of all parish and School employees and volunteers who work with children regularly, and conducts a criminal history background checks of all current and prospective employees and volunteers that work with children regularly. In addition, a structure for oversight of compliance with policies and procedures for the creation of safe environments for children at Parishes and Schools was established.

The Committee does not believe that the Diocese's historical response to sexual abuse has been adequate. The Plan includes signficiant additional non-monetary undertakings by the Diocese that to further minimize the risk of future sexual abuse.

**B.**    **The Reorganization Case.**

The Diocese's attempts to resolve the Tort Claims pending out of Court were unsuccessful. It is desirous of achieving a final just, equitable, and fair resolution for those persons who suffered abuse so that this dark chapter in the history of the Diocese can be closed. Accordingly, the Reorganization Case was filed on October 10, 2006.

## VI.    SIGNIFICANT EVENTS IN CHAPTER 11.

The significant events which have occurred since the Petition Date are as follows:

- The Court entered orders authorizing the Diocese to employ the Debtor's Professionals who are:

  - The law firm of Lane & Waterman LLP;
  - The accounting firm of McGladrey & Pullen LLP.

- Because of the sensitive nature of the Tort Claims and the concern of the Diocese not to publicize the names of the survivors, the Diocese requested that certain information regarding the Tort Claimants be filed confidentially with the Claims Administrator, Alix Partners. This request was approved by the Court.

- The Court granted the Diocese's application to pay certain prepetition wages to its employees.

- The Court granted the motion to allow the Diocese to continue to honor certain employee benefit plans for vacation and sick pay in order to retain its current employees.

- The Court granted a motion to allow the Diocese to continue its current bank accounts and current cash management system in order to avoid disruption in the Diocese's business.

- The Court set July 16, 2007, as the Bar Date by which all Claims against the Diocese were to be filed.

- The United States Trustee appointed the Official Committee of Unsecured

28

Creditors and the Court approved the retention of Pachulski, Stang, Ziehl, Young, Jones, Weintraub as attorneys for the Committee.

- The Court appointed Michael Murphy as the Unknown Claims Representative to represent the interests of the Unknown Tort Claimants in the Bankruptcy case.

- On November 28, 2007, after four days of intensive mediation between the Diocese, the Committee, Travelers, and the Unknown Tort Claimants Representative, the parties reached a global settlement which set the terms for a consensual reorganization plan.

## VII. DESCRIPTION OF THE PLAN.

The following description of the Plan is for informational purposes only. Creditors should not rely on this description for voting purposes, but should read the Plan in its entirety. This summary of the Plan does not purport to be complete. THE PLAN IS CONTROLLING IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE CONTENTS OF THE PLAN AND THIS DISCLOSURE STATEMENT.

### A.    Classification And Treatment Of Claims Under The Plan.

#### 1.    Claim Amounts.

Until Allowed by the Court, Claims against the Diocese are in unknown or undetermined amounts. Accordingly, the amounts of Claims specified in this Disclosure Statement reflect only the Diocese's best estimates. Additionally, the amounts of Claims specified in this Disclosure Statement do not include all Claims that may arise from the rejection of any executory contracts or other contingent or unliquidated Claims against the Diocese.

#### 2.    Effective Date of the Plan.

The "Effective Date" of the Plan determines when the performance of the obligations under the Plan are due. The Effective Date is set forth in the Plan.

### 3. Classification generally.

The Plan divides Claims against the Diocese into seven (7) separate Classes which the Diocese believes complies with the requirements of the Bankruptcy Code. The respective treatments under the Plan of Allowed Claims are in full discharge and satisfaction of those Allowed Claims. Except as provided in the Plan, all Claims against the Diocese arising prior to entry of the Petition Date will be discharged as of the Confirmation Date pursuant to Bankruptcy Code § 1141(d).

### B. Unclassified Administrative and Priority Claims.

### 1. Administrative Claims.

The Administrative Claims consist of the allowed Professional Fees and other Claims that would be allowable as Administrative Claims pursuant to Bankruptcy Code § 503. Holders of Allowed Administrative Claims will be paid in full on the Claims Payment Date or such later date as provided in the Plan.

### C. Unimpaired Claims.

### 1. Priority Employee Unsecured Claims - Class 1. Unimpaired.

Class 1 consists of every Unsecured Claim of an employee of the Diocese for vacation or sick leave pay which is otherwise entitled to priority pursuant to Bankruptcy Code § 507(a)(4)(A). All Allowed Priority Employee Unsecured Claims will be satisfied, in full, in accordance with the policies and procedures regarding vacation and sick leave pay in effect at the Diocese at the time such Priority Employee Unsecured Claim becomes matured and liquidated. Because the Bankruptcy Court granted the Debtor's motions to pay prepetition wages and to continue to honor the Diocese's sick pay and vacation policy, and such liabilities are assumed by the Reorganized Debtor, there will be no such claims paid by the Estate. The liability for honoring the sick pay and vacation policy and paying any prepetition wages to the employees

is approximately $160,888.00.

### 2.   Priority Unsecured Claims.

Unless an Allowed Priority Unsecured Claimant agrees otherwise, the holder of every

Allowed Priority Unsecured Claim will be paid in full on the Claim Date or when the claim is

allowed by the Court. The Priority Unsecured Claims include all Claims entitled to priority pursuant

to Bankruptcy Code § 507 other than Employee Unsecured Priority Claims which are treated

elsewhere in the Plan. The Diocese does not believe that there are any Priority Unsecured Claims.

Consistent with Bankruptcy Code § 1129(a)(9)(C), the holder of any Allowed Priority Tax Claim

will be paid in full within five (5) years of the date of the Petition Date. The Diocese does not

believe there are any Priority Tax Claims.

### 3.   Secured Claims – Class 3 - Unimpaired.

Class 3 consists of all Allowed Secured Claims against property of the Diocese which will

not be transferred to the Settlement Trust. At the option of the Reorganized Debtor, either (a) the

legal, equitable and contractual rights to which such Claim holder is entitled will be left unaltered;

(b) the claim shall be left Unimpaired under Bankruptcy Code § 1124; (c) the holder of such Claim

shall receive and retain the collateral securing the Claim; or (d) the holder of the Claim shall receive

Cash from the Reorganized Debtor on the Effective Date in an amount equal to the value of the

Collateral securing the Claim. To the extent the value of the Collateral securing any such claim is

less than the amount of the Allowed Secured Claim, the deficiency shall be a General Unsecured

Claim. The Reorganized Debtor shall be solely responsible for any payments to the holder of an

Allowed Secured Claim. Notwithstanding the foregoing, the Reorganized Debtor shall pay to the

Settlement Trust all monies necessary to pay the holder of any Allowed Secured Claim on account

of any Trust asset.

### General Unsecured Convenience Claims – Class 4 - Unimpaired.

Class 4 consists of all Allowed General Convenience Unsecured Claims. A general unsecured creditor can elect to receive $500 or the amount due to the holder thereof, whichever is less, on the first Claim Payment Date in full and complete satisfaction of its Claim. The Reorganized Debtor shall be solely responsible for any payments to the holder of an Allowed Secured Claim.

**D.**    **Impaired Claims.**

**1.**    **Class 5: General Unsecured Claims.**

The Class 5 Claims will consist of all Claims that are not General Unsecured Convenience Claims, Administrative Claims, Priority Unsecured Claims, Priority Employee Unsecured Claims, Other Tort and Employee Claims, Tort Claims or Convenience General Unsecured Claims. The Class 5 Claims consist of certain unsecured trade/vendor claims. The total amount of General Unsecured Claims are approximately $9,013.48. The holders of Allowed General Unsecured Claims will be paid in full over time in monthly installments commencing thirty (30) days after the Effective Date through the twentieth (20th) month after the Effective Date by the Reorganized Debtor without interest. The Reorganized Debtor will have the right to prepay any one or more of the Class 5 Claims.

**2.**    **Class 6: Other Tort and Employee Claims.**

The Class 6 Other Tort and Employee Claims are those unsecured claims, demands, suits, causes of action, proceedings or any other rights or asserted right to payment heretofore, now or hereafter asserted against the Debtor, whether or not reduced to judgment, based upon or in any manner arising from acts or failure to act by the Debtor which has allegedly resulted in injury asserted against the Diocese for torts, including claims by employees of the Diocese, other than

32

Tort Claims. Each Class 6 Other Tort and Employee Claimant, as and when such Claim becomes

an Allowed Claim, will be paid solely from the proceeds of any insurance policies applicable to

such Claim, except for Insurance Policies issued or allegedly issued by Settling Insurers. To the

extent that such Claims are not paid in full by the insurance proceeds, then such Other Tort and

Employee Claims, to the extent not so satisfied, will be Disallowed.

3.      **Class 7: Tort Claims.**

(a)      Definition of Class 7 Tort Claims.

The Class 7 Tort Claims mean all Claims, demands, suits, causes of action, proceedings

or any other rights or asserted rights to payment for acts involving or arising out of sexual abuse

committed by any clergy or other persons associated with the Diocese, including but not limited

to all employees and volunteers. Class 7 shall consist of all Tort Claims, including, without

limitation, all Unknown Tort Claims.

On or before the Effective Date (but after entry of the Confirmation Order), in full release

satisfaction and discharge of all Tort Claims, the Diocese will: (a) establish the Settlement Trust

which provides for liquidation of Tort Claims and payment of Tort Claims as and when they

become Allowed Tort Claims by the execution of the Settlement Trust Agreement, a proposed

copy of which is attached hereto as Exhibit "G"; (b) the Diocese will fund the Settlement Trust

with $33,100,000; (c) transfer the Chancery (or sale proceeds if the Chancery is sold before the

Effective Date) to the Settlement Trust, (d) transfer Avoidance Actions to the Settlement Trust; and

(e) entitlement to the any proceeds of the Diocese Insurance Policies as set forth in the Plan.

(b)      Treatment of Sexual Abuse Tort Claims.

Each Tort Claimant will automatically be included in the Settlement Trust. All Tort

Claimants will have their Tort Claims treated and resolved under the Settlement Trust. The

Settlement Trust will be funded from the transfers by the Diocese on the Effective Date; earnings

obtained by the Trustee from investments of such assets after the Effective Date; Insurance

Recoveries from Diocese Insurance Policies which are payable to the Settlement Trust obtained

before or after the Effective Date; and payments from participating Catholic Entities.

All Tort Claims will be treated as either (a) a Convenience Tort Claim, which will is a

Tort Claim to be allowed and paid under the Convenience Process; (b) a Matrix Tort Claim,

which is a Tort Claim to be allowed and paid under the Matrix Process; (c) a Litigation Tort

Claim, which is a Tort Claim to be allowed and paid under the Litigation Process; or (d) a Non-

Releasing Litigation Tort Claim which is a Tort Claim to be allowed and paid under the

Litigation Process. **THE ELECTION BY THE HOLDER OF EACH TORT CLAIM**

**SHALL BE MADE ON THE HOLDER'S BALLOT BY EXECUTING AND**

**DELIVERING THE BALLOT TO THE DEBTOR NO LATER THAN THE BALLOT**

**DEADLINE, WHICH IS APRIL 23, 2008**[2]

The holder of a Tort Claim electing to be treated as a Convenience Tort Claim, a Matrix

Tort Claim, or a Litigation Tort Claim shall also execute and deliver the Release of Claims form

incorporated into the Ballot whereby the Tort Claimant shall release any and all claims against

certain third parties in exchange for such treatment under the Plan. The holder of a Tort Claim

electing to be treated as a "Litigation Tort Claim" or a "Non-Releasing Litigation Tort Claim"

shall be required to file a petition pleading such claims in the Iowa District Court for Scott

---

[2] If the holder of any Tort Claim has previously filed a bankruptcy petition it is imperative that
the Tort Claimant determine whether any portion of any payment received from the Settlement
Trust is subject to turnover to their bankruptcy trustee.Any Tort Claimant who filed a bankruptcy
petition subsequent to the time when the Abuse occurred should consult with his or her
bankruptcy attorney and/or the trustee in his or her bankrputcy case to determine whether any or
all of the proceeds of the Tort Claim must be turned over to the Tort Claimant's bankruptcy
trustee and whether or not any portion of the proceeds of the Tort Claim may be claimed as
exempt under the applicable law to the Tort Claimant at the time the Tort Claimant's bankruptcy
petition was filed.

County and shall file and serve the petition and original notice on the Settlement Trustee within 60 days after the Effective Date of the Plan. If the holder of a Litigation Tort Claim or a Non-Releasing Litigation Tort Claim does not file such a petition, such Tort Claim shall be treated as the holder of a Convenience Tort Claim, which election shall be irrevocable and non-amendable. The holder of Litigation Tort Claims and Non-Releasing Litigation Tort Claim who have previously filed petitions in the Iowa District Court for Scott County (or other counties) are not required to file a new petition and the Settlement Trustee shall be substituted as the defendant therein in place of the Diocese and the case shall be transferred to Iowa District Court for Scott County.

At any time prior to the date in which the Settlement Trustee has filed a dispositive motion or trial has commenced on the Claim, the holder of a Litigation Tort Claim or a Non-Releasing Litigation Tort Claim may amend his or her election to elect treatment as a Convenience Tort Claim or a Matrix Tort Claim by delivering written notice of such election (and in the case of a holder of a Litigation Tort Claim, a Release of Claims form) to the Special Arbitrator and the Settlement Trustee. Any such amended election shall be irrevocable and non-amendable. Any such amended election shall be deemed to be consent to a limitation on the amount of any distribution with respect to an Allowed Tort Claim to the lesser of (1) the Tort Claimant's proportion of the Litigation Fund minus all prelitigation Professional Fees and Expenses attributable to such Claim and the poriton of all other Settlement Trust Costs and Expenses allocated to the Litigation Fund or the NonReleasing Litigation Fund, as the case may be; or (2) the distribution which Claimant would have received from the applicable Fund by electing to be treated as a Convenience Tort Claim or a Matrix Tort Claim.

Any Tort Claimant electing on the Ballot to be treated as a Matrix Tort Claim may

thereafter amend the election to be treated as a Convenience Tort Claim. **THE HOLDER OF ANY TORT CLAIM WHO DOES NOT ELECT A TREATMENT ON THE HOLDER'S BALLOT BY EXECUTING AND DELIVERING THE BALLOT TO THE DEBTOR BEFORE THE BALLOT DEADLINE SHALL BE DEEMED TO HAVE ELECTED TO BE TREATED AS THE HOLDER OF A CONVENIENCE TORT CLAIM AND SHALL BE DEEMED TO HAVE EXECUTED AND DELIVERED A RELEASE OF CLAIMS.** Notwithstanding the foregoing, the Settlement Trustee shall give such a non-electing Tort Claimant written notice by United States Mail within 15 days after the Effective Date and the right to elect alternative treatment as set forth in the Plan. If the Tort Claim holder still does not then execute and deliver to the Settlement Trustee an election of treatment and, if applicable, a Release of Claims within 45 days after the Effective Date, such holder shall then be **IRREVOCABLY** deemed to have elected treatment as a Convenience Tort Claim and to have executed a Release of Claims with no further right to elect other treatment.

(c)    Convenience Tort Claim Process.

The holder of each allowed Convenience Tort Claim shall be paid from the Convenience Fund on the later of the Claim Payment Date or the date which is 30 days after the date Funds are allocated to the Convenience Fund. A Convenience Tort Claim shall be allowed in the fixed amount of $10,000 if and only if the Special Arbitrator determines, based on the Tort Claimant's Proof of Claim filed in the Bankruptcy Case and, if requested by the Special Arbitrator, the Tort Claimant's Questionnaire, that a preponderance of the evidence shows that the Tort Claimant was Abused. The Special Arbitrator shall not consider (i) any applicable statute of limitations or (ii) the passage of time since the date(s) of such Abuse, or (iii) any other defenses of Debtor, in making such determination. However, the Special Arbitrator may consider the credibility of the

36

Tort Claimant and the facts alleged in support of the Tort Claim.

      (d)    Matrix Tort Claim Process.

     The holders of the Tort Claims electing treatment as a the Matrix Tort Claim shall be deemed to have agreed to the process set forth in the Matrix Protocol set forth in the Plan. Each holder of an Allowed Matrix Tort Claim shall be paid in Cash by the Settlement Trust such holder's share of the Matrix Fund within 30 days after the date on which all Matrix Tort Claims have been Finally Determined. The Matrix Tort Claims shall be determined and Allowed by the Special Arbitrator if the Tort Claimant proves by a preponderance of the evidence that the Tort Claimant was Abused. If a Matrix Tort Claim is Allowed, the Special Arbitrator shall then determine the amount of such Tort Claim by assigning the Matrix Tort Claim a value pursuant to the Matrix Protocol. This protocol includes a broad range of weighted factors including the nature and extent of abuse, effects and damages of abuse, the Diocese's legal liability, the applicability of the statute of limitations and miscellaneous factors, including the extent to which the Tort Claimant was involved in formal litigation. The Special Arbitrator may consider the credibility of the Tort Claimant and the facts alleged in support of the Tort Claim and, in the Special Arbitrator's sole and absolute discretion, reduce or deny any Tort Claim.

      (e)    Proof of Abuse and Notice of Arbitration.

     Within 30 days after written request from the Special Arbitrator, the holder of a Tort Claim who has elected to be treated as a Matrix Tort Claim (1) shall complete under oath the Questionnaire submitted by the Special Arbitrator; and (2) shall produce all records and documents requested by the Special Arbitrator; and (3) shall consent to and cooperate in any examination requested by the Special Arbitrator to be performed by health care professionals selected by the Special Arbitrator; and (4) shall consent and cooperate in written and/or oral examinations under oath by the Special

Arbitrator. The Special Arbitrator may, but shall not be required, to obtain evidence from the Debtor, the Reorganized Debtor or any other person, and shall have all of the rights and powers of the Debtor to take discovery under Part VII of the Bankruptcy Rules. The Special Arbitrator's determinations shall be made expeditiously. The Special Arbitrator's assessment of credibility and competency of evidence shall be within the sole discretion of the Special Arbitrator.

Upon reaching a decision, the Special Arbitrator shall notify the Tort Claimant in writing of the decision of the amount of the Matrix Fund that will be distributed to the Tort Claimant, which determination shall be final unless the Tort Claimant makes a timely request for reconsideration and shall not be subject to any appeal whatsoever. The Tort Claimant may request reconsideration of such determination by delivering a written request for reconsideration to the Special Arbitrator within 20 days after the date of the Special Arbitrator's decision and may submit additional evidence and argument in support of such request. No other person may request reconsideration or submit additional evidence or argument. The Special Arbitrator shall notify the Tort Claimant in writing of the Special Arbitrator's determination of any such request for reconsideration. The Special Arbitrator's determination of any request for reconsideration shall be final and not subject to any appeal.

All Tort Claimants participating in the Matrix Process will bear a portion of the fees and costs incurred by those Tort Claimants participating in the Matrix Process who are represented by counsel. Under the Plan, the amount of fees and costs owed to attorneys representing such Tort Claimants shall be calculated in accordance with their retainer or fee agreements. That amount will be deducted from the Matrix Fund before any determinations are made by the Special Arbitrator and paid to the attorneys in accordance with their prepetition fee agreements. In effect, unrepresented Tort Claimants will bear a portion of these fees and expenses and represented Tort Claimants will

pay a fee that is less than provided for in the retainer or fee agreements. The Diocese and the Committee cannot determine this percentage until Tort Claimants make their elections under the Plan. The Committee, which includes a Tort Claimant who is not represented by counsel, unanimously endorsed this treatment as fair because it was the prepetition litigation undertaken by the represented Tort Claimants that enabled the unrepresented Tort Claimants a meaningful opportunity to participate in a monetary settlement.

    (f)    <u>Unknown Tort Claims Process.</u>

The Court has appointed an Unknown Tort Claims Representative to represent the interests of any Unknown Tort Claimants. All Unknown Tort Claimants shall be deemed satisfied in full when the Unknown Tort Claims Fund is funded under the Settlement Trust. Each holder of an Allowed Unknown Tort Claim which is filed before the 9th anniversary of the Effective Date shall be paid from the Unknown Tort Claims Fund within 30 days after the date on which the Unknown Tort Claim is Finally Determined. The holder of an Unknown Tort Claim may elect to proceed under the Unknown Tort Claim Matrix Process or the Unknown Tort Claim Litigation Process. Such election may be made by filing with the Settlement Trustee a Proof of Claim form to be furnished by the Settlement Trustee or by filing a petition in the Iowa District Court for Scott County, if electing the Unknown Tort Claim Litigation Process. Each Proof of Claim from a holder of an Unknown Tort Claim electing the Unknown Tort Claim Matrix Process shall also include and execute a Release of Claims.

Unknown Tort Claims electing the Matrix Process shall be submitted to the Special Arbitrator and shall be allowed if the Special Arbitrator determines by a preponderance of the evidence that the holder (i) was Abused; and (ii) the applicable statute of limitations under applicable non-bankruptcy law had not begun to run on or before October 10, 2006; and (iii) if

39

the Special Arbitrator does not find that there is clear and convincing evidence that the applicable statute of limitations applicable under non-bankruptcy law had run after October 10, 2006 and before the holder filed a Proof of Claim with the Settlement Trustee. If the Claim is Allowed, the Special Arbitrator shall determine the amount of the Claim by assigning a value pursuant to the Matrix Protocol.

If the Unknown Tort Claimant elects to proceed under the Unknown Tort Claim Litigation Process, the Claim shall be determined by a trial of such Claim conducted in the Iowa District Court for Scott County, or a settlement between the holder of such Claim and the Settlement Trustee. Such Claim is subject to all defenses available to Debtor, including but not limited to the applicable statute of limitations. All Unknown Tort Claims filed after the 9th anniversary of the Effective Date shall have no right to payment or any other rights under the Plan, and all such Claims shall be and are Discharged under the Plan.

(g)    Channeled Claims.

All Tort Claims including, without limitation, Unknown Tort Claims, against the Debtor, Catholic Entities and Settling Insurers shall be channeled to the Settlement Trust and exclusively treated and administered pursuant to the provisions and protocols of the Plan and Settlement Trust. Any Tort Claim which is disallowed under any procedure or process set forth in the Plan or otherwise, shall have no further rights against the Debtor, the Reorganized Debtor, Catholic Entities, Settling Insurers, the Settlement Trust or any Fund and such Claims shall be deemed to have been Discharged under the Plan.

The Settlement Trustee and the Special Arbitrator shall succeed to all rights and duties of Debtor with respect to all Tort Claims and shall have complete control of the conduct of the proceedings with respect to the processing, allowance and treatment of such Claims as set forth

in the Plan. The Settlement Trustee shall have complete control of settlements of any Litigation Tort Claims, Non-Releasing Litigation Tort Claims and Unknown Tort Claims who elect to proceed under the Unknown Tort Claim Litigation Process. The Special Arbitrator shall have no authority with respect to any Tort Claim other than a Matrix Tort Claim or an Unknown Tort Claim electing to proceed under the Matrix Process. No one except the holder of a Matrix Tort Claim being determined and the Special Arbitrator, the Settlement Trust or the Reorganized Debtor shall have standing to participate in any aspects of such proceedings.

(h)    Litigation Tort Claim Process.

The holder of an Allowed Litigation Tort Claim shall be paid by the Settlement Trust the holder's pro rata share of the Litigation Fund within 30 days after the date on which all Litigation Tort Claims have been Finally Determined. The holder of an Non-Releasing Litigation Tort Claim shall be paid by the Settlement Trust the holder's pro rata share of the Non-Releasing Litigation Fund within 30 days of the date on which all Non-Releasing Litigation Tort Claims have been Finally Determined.

Allowance. Allowance of a Litigation Tort Claim or a Non-Releasing Litigation Tort Claim shall be determined either by entry of a final judgment in the Iowa District Court for Scott County or a settlement agreement between the Tort Claimant and the Settlement Trustee. All Litigation Tort Claims or Non-Releasing Litigation Tort Claims are subject to all defenses available to Debtor, including, but not limited to, the applicable statute of limitations. Nothing in the Plan shall affect any right of the holder of a Litigation Tort Claim or Non-Releasing Litigation Tort Claim to demand a jury trial under applicable Iowa law.

(i)    Discretion to Defer or Accelerate Payments.

41

The Settlement Trustee shall have the discretion to defer or pro rate any distribution to holders of Allowed Tort Claims if the Settlement Trustee determines, in its sole discretion, that there are not or may not be sufficient funds available to pay such Claims on the date when such distribution is payable. Promptly after the date on which the Convenience Fund has been funded and sufficient funds are available in other funds, the Settlement Trustee may make an interim distribution of $15,000 per Claim to the holders of Matrix Tort Claims which have not yet been Allowed but as to which the Special Arbitrator has determined that there is not a material likelihood that the Claim of such holder will receive less than $15,000.

The Settlement Trustee shall be Robert L. Berger and the Special Arbitrator shall be Richard M. Calkins. If the Special Arbitrator or the Settlement Trustee resigns or is otherwise unable to serve, the Reorganized Debtor and the Committee may unanimously nominate a successor whose appointment shall be subject to the approval of the Bankruptcy Court after notice and hearing. If the Reorganized Debtor or Committee do not unanimously appoint a successor within 45 days after the Special Arbitrator or the Settlement Trustee resigns or becomes unable to serve, the Bankruptcy Court shall designate a successor after notice and hearing.

(j)     Application on Non-Debtors.

While the obligations of the Settlement Trust (including obligations of the Special Arbitrator and the Settlement Trustee) to pay holders of Class 7 Tort Claims shall be determined pursuant to the Plan, to the extent any such Tort Claim is asserted against a Non-Debtor and Insurance Coverage is sought, the Claim must be validly and effectively tendered to the applicable Insurance Company and the Insurance Company may respond to the Tort Claim as between itself and the Tort Claimant (or any Person or Entity acting in his/her stead) just as it would or could have outside bankruptcy. The propriety and effectiveness of any tender to the

42

Insurance Company, will be determined under the Insurance Policy and applicable State law. Any such Insurance Company will be entitled to all rights as are provided under the terms of the relevant Insurance Policy and applicable State law, including any right to control and manage the defense of the Tort Claim against the Non-Debtor as if the Tort Claim had never been treated or Resolved for Payment under the Plan. The Non-Debtor insured and/or any entity standing in its stead by virtue of a valid assignment of rights under an Insurance Policy or valid assumption of, succession to, the insured's rights to object to, resolve or defend the claim, shall be obligated to perform the insured's obligations under such Insurance Policy, including any duty of cooperation, to the extent that the Insurance Policy and/or State law so provides. Any right of a Non-Debtor insured, or any assignee or other Person or Entity acting in its stead, to settle, litigate or otherwise resolve any Tort Claims for payment after, or in lieu of tender of such claims to the Insurance Company shall be determined by the applicable Insurance Policy and the applicable State law.

Any Non-Settling Insurer shall be entitled to a copy of all such information relating to any Tort Claim it is investigating, evaluating, handling or defending, or is relevant to any Insurance Company defense, provided such Non-Settling Insurer enters into an appropriate confidentiality agreement.

**H.    Division of Settlement Trust into Funds.**

As soon as practicable after the Effective Date, the Settlement Trust will be divided into several individual funds. A Settlement Trust Reserve will be established by the Settlement Trustee to pay for the Settlement Trust Costs and Expenses, including Post-Confirmation Professional Fees, fees of the Special Arbitrator, and reasonable reserve contingencies. The Settlement Trustee may increase or decrease the Settlement Trust Reserve in the future. The

Settlement Trustee shall allocate the remaining funds to the Estate Fund and the Release Fund. The there shall be allocated to the Estate Fund (a) all Cash received from the Estate, but excluding any Cash or other property from any participating Catholic Entities in consideration for Channeled Claims; (b) the Insurance Recoveries that are proceeds from Insurance Policies issued to the Diocese and Catholic Entities by Insurance Companies; and (c) Cash in any other property received from any Catholic Entities in consideration for any Channeled Claims.

The balance of the Estate Fund and the Release Fund shall be allocated by the Settlement Trustee as follows:

An amount equal to the sum of all allowed Convenience Tort Claims plus a reasonable reserve, multiplied by the number of Convenience Tort Claims that have not been Finally Determined shall be allocated from the Estate Fund and the Release Fund in the Funding Proportion.

Unknown Tort Claims Fund: $2,500,000 for allowed Unknown Tort Claims Matrix Fund, Litigation Fund and Non-Releasing Litigation Fund:  The balance of the Estate Fund and the Release Fund shall be allocated to the Matrix Fund, the Litigation Fund, and the Non-Releasing Litigation Fund. The Special Arbitrator shall estimate the aggregate amount of the Matrix Tort Claims, the Litigation Tort Claims and the Non-Releasing Litigation Tort Claims by assigning each claim a value pursuant to the Matrix Protocol and shall then mail a summary of such estimation to the holders of all Tort Claims and to their counsel. The estimated amount shall be reviewable by the Bankruptcy Court only upon the filing of a motion of a party in interest filed within 10 days after the date such summary of estimation is mailed by the Special Arbitrator and shall be approved by the Bankruptcy Court unless the moving party proves that the Special

44

Arbitrator's estimation in the aggregate constitutes an abuse of discretion. Individual estimated amounts shall not be reviewable, but only the aggregate amounts.

The balance of the Estate Fund, net of the Settlement Trust Reserve, the Convenience Fund and the Unknown Tort Claims Fund shall be allocated proportionately in accordance with the Special Arbitrator's estimation to the Matrix Fund, the Litigation Fund, and to the Non-Releasing Litigation Fund based on the relative proportions of the estimated aggregate of the Tort Claims in each category. The balance of the Release Fund, net of the set aside for the amount allocated to the Settlement Trust Reserve, the Convenience Fund and the Unknown Tort Claims Fund shall be finally and conclusively allocated to the Matrix Fund and the Litigation Fund based on the relative proportions of the Tort Claims in each category, with nothing being allocated from the Release Fund to the Non-Releasing Litigation Fund.

After the Estate Fund and the Release Fund have been allocated among the Convenience Fund, the Unknown Tort Claims Fund, the Matrix Fund, the Litigation Fund and the Non-Releasing Litigation Fund, all such funds will be separately administered by the Settlement Trustee and all Settlement Trust costs and expenses of each fund, including the costs of litigating or otherwise determining the allowable amount of the Tort Claims potentially payable from such fund shall be borne solely by such fund. If there is any balance remaining in the Convenience Fund after all allowed Convenience Claims are paid from such fund, and all Settlement Trust costs and expenses of such fund are paid in full, the balance shall then be distributed to the Matrix Fund, the Litigation Fund and the Non-Releasing Litigation Fund in proportion to the original allocations. Likewise, if there is any balance remaining in the Litigation Fund and the Non-Releasing Litigation Fund after all allowed Claims payable from such funds are paid in full,

and all Settlement Trust costs and expenses of such fund are paid in full, such balances shall be distributed to the Matrix Fund.

**I.    Estimated Distributions To Creditors.**

The following is a summary of the estimated distributions for each of the holders of Allowed Claims (or provisionally Allowed Claims) under the Plan.

| Class/Nature of Claim | Treatment | Approximate Total Estimated Allowed (Or Provisionally Allowed) Claims | Estimated Dates of Distributions | Estimated Distributions |
|---|---|---|---|---|
| Class 1 Pre-Petition Employee Claims | Unimpaired | $160,888.00 | When due to employee under Reorganized Debtor's policies for employee benefits | To be satisfied by Reorganized Debtor |
| Class 2 Priority Unsecured Claims | Unimpaired | None | None anticipated | None |
| Class 3 Secured Claims | Unimpaired | None | None anticipated | None |
| Class 4 Unsecured General Convenience Claims | Unimpaired | $5,000 | Claims Payment Date | $500 per Claim |
| Class 5 General Unsecured Claims | Impaired | $9,013.48 | Paid in full in installments beginning 30 days after the Effective Date and monthly thereafter with interest | $9,013.48 |
| Class 6 Other Tort and Employee Claims | Impaired | None known | To be paid from proceeds of applicable insurance to the extent available. Otherwise, none. | None |
| Class 7 Tort Claims | Impaired | Unknown | To be paid by the Settlement Trust pursuant to the terms of the Plan | $33 million |

## VIII.    **Means For Execution of the Plan.**

### A.    **Creation and Funding of the Settlement Trust.**

On or before the Effective Date (but after entry of the Confirmation Order), the Reorganized Debtor will, in full and final release, satisfaction and discharge of all Tort Claims cause the following to occur: (a) the execution and delivery of the Settlement Trust Agreement which will establish the Settlement Trust; (b) the delivery of the Cash necessary for the Diocese to meet its funding obligations under the Plan as of the Effective Date; and (c) the execution and delivery of any other agreements, assignments or commitments to carry out the terms of the Plan or the funding of the Settlement Trust. Any funds received from the Chancery or Insurance Recoveries allocated to the Settlement Trust received after the Effective Date will also be paid to the Settlement Trustee to be held and distributed in accordance with the Settlement Trust.

### B.    **Treatment of Executory Contracts.**

1.    Assumption and Rejection of Executory Contracts.

On the Confirmation Date, except as otherwise provided herein, all Executory Contracts of the Debtor will be deemed rejected in accordance with the provisions and requirements of Bankruptcy Code §§ 365 and 1123 other than those Executory Contracts that: (a) have already been assumed by order of the Bankruptcy Court; (b) are subject to a motion to assume Executory Contracts that is pending on the Confirmation Date; or (c) are subject to a motion to reject an Executory Contract pursuant to which the requested effective date of such rejection is after the Confirmation Date. Approval of any motions to assume Executory Contracts pending on the Confirmation Date will be approved by the Bankruptcy Court on or after the Confirmation Date by a Final Order. Each Executory Contract assumed will revest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as such terms are modified by the

provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its

assumption or applicable law.

2.      Claims Based on Rejection of Executory Contracts.

Every Claim asserted by a Creditor arising from the rejection of an Executory Contract

pursuant to the Plan must be filed with the Bankruptcy Court no later than the first Business Day

which is thirty (30) days after the Confirmation Date or the first Business Day that is thirty (30)

days after entry of the Final Order of the Bankruptcy Court approving rejection if such Final

Order is entered after the Confirmation Date. Every such Claim which is timely filed, as and

when it becomes an Allowed Claim, will be treated under Class 5 of the Plan. Every such Claim

which is not timely filed by the deadline stated above will be forever barred, unenforceable, and

discharged, and the Creditor holding the Claim will not receive or be entitled to any distribution

under the Plan on account of such Claim.

3.      Effect of Assumption of Executory Contracts.

Any Executory Contracts assumed prior to the Effective Date, whether assumed prior to

the Confirmation Date or as part of the confirmation process will be dealt with in accordance

with the terms of the Executory Contract.

4.      Congregation of Humility of Mary Ground Lease.

The Ground Lease dated October 16, 1981 by and between the Debtor and Congregation

of the Humility of Mary will be deemed and treated as an Executory Contract that is assumed by

the Reorganized Debtor pursuant to the Plan and Bankruptcy Code § 365 as of the Effective

Date. Accordingly, the obligations of the Debtor under such ground lease will survive

unimpaired and unaffected by entry of the Confirmation Order, irrespective of whether such

obligation occurs before or after the Petition Date.

C.    **Funding on the Effective Date.**

All payments under the Plan which are due on the Effective Date will be funded from the

Cash on hand; the transfer of the Chancery real estate; and contributions or settlements with

Catholic Entities and Settling Insurers. The Diocese will fund $33.1 million with cash on hand;

approximately $2 million that it intends to borrow on or before the Effective Date; $3 million

contributed by St. Vincent Home; $1 million contributed by St. Anthony's Parish; $1 million

contributed by Sacred Heart Cathedral; $650,000 contributed by St. Mary's Parish; and $250,000

contributed by Our Lady of Lourdes Parish; and $19.5 million paid by the Settling Insurers. As

additional consideration, the Catholic Entities agreed to sell their Travelers Insurance Policies

back to Travelers. The known policies being sold back to Travelers by the Catholic Entities are

identified on Schedule 1.1.15 attached to the Settlement Agreement. The Diocese and the

Catholic Entities believe these policies have significant value in relation to the global settlement

of the Tort Claims reached with the Tort Claimants, the Committee and the Unknown Claims

Representative. Accordingly, the combination of the sale of both the Diocese and Catholic

Entities policies to Travelers greatly enhances the settlement funds available for distribution to

the Tort Claimants under the Plan. Moreover, the settlement removes the uncertainty and

expense of litigation by and among the Diocese, the Catholic Entities, the Settling Insurers and

the Committee and fully monetizes all of these interrelated claims. The alternative is continuing

uncertainty, litigation and expense that might easily consume the entire Estate ($20 million was

spent on litigation in the Portland Archdiocese case and $10 million was spent on litigation in the

Spokane Diocese case).[3]

---

[3] The most recent Catholic Entity Policies that are being sold to Travelers under the
Settlement Agreement were issued in 1995 and most are much older going back to the 1950's
and 60's. It is extremely unlikely that any non-abuse claims would be made against the Catholic
Entities  under these policies because the statute of limitations on non-abuse claims would have

Similarly, the Diocese believes that the $5.9 million contributed by the Catholic Entities, when combined with the funds to be paid by Travelers and the Diocese, will provide the Tort Claimants with a greater recovery from the Settlement Trust than they would otherwise receive by settling only with the Diocese and retaining their claims against the Catholic Entities. The vast majority of the Tort Claims involve Catholic Entities with extremely limited or non-existent resources to pay Tort Claims brought against them and lack proof of any significant insurance coverage for Tort Claims. Those Catholic Entities having significant claims and available resources have agreed to contribute significant funds to the settlement. Without the inclusion of the Catholic Entities in the settlement, it would trigger a race to the courthouse; the first Tort Claimants to obtain judgments might get something while later claimants would get nothing. By channeling the Tort Claims to the Settlement Trust, Tort Claimants will be paid more than could be realized if the Tort Claimants were not enjoined from prosecuting their claims against the Catholic Entities. Elimination of the channeling injunctions would result in less money going to the Tort Claimants.

The Diocese and the Committee investigated the insurance coverage of the Catholic Entities available to cover the Tort Claims. The Diocese and Committee, independently, reached the conclusion that, given the extremely limited resources of most of the Catholic Entities involved in the Tort Claims and the cost and expense to the Estate and the Tort Claimants to litigate actions against the Catholic Entities and their insurers, the funds being paid to the Settlement Trust through the are fair and reasonable under the circumstances.

**D.**    **Funding After the Effective Date.**

---

run many years ago. Accordingly, the Diocese and the Catholic Entities made a business judgment that it is in their best interests to sell back and monetize the Travelers policies as part of the settlement with the Tort Claimants.

The funds necessary to ensure continuing performance under the Plan after the Effective Date will be (or may be) obtained from proceeds received after the Effective Date from future Insurance Recoveries from the Diocese Insurance Policies.

**E.      Procedure for Determination of Claims Other Than Tort Claims.**

(a) <u>Objections to Claims.</u> Notwithstanding the occurrence of the Effective Date, and except as to any Claim that has been Allowed prior to the Effective Date or any Tort Claim, the Reorganized Debtor may object to the allowance of any Claim against the Debtor or seek estimation thereof on any grounds permitted by the Bankruptcy Code by filing an objection within one hundred eighty (180) days after the Effective Date.

(b) <u>Disputed Claims.</u> No payments or other distributions will be made to holders of Claims unless and until such Claims are Allowed Claims pursuant to a Final Order.

(c) <u>Treatment of Contingent Claims</u>. Until such time as a Contingent Claim or a Contingent portion of an Allowed Claim becomes fixed or absolute or is disallowed, such Claim will be treated as a Disputed Claim for all purposes related to distributions under the Plan.

**F.      Preservation of Debtor's Claims, Demands, And Causes of Action.**

All claims, demands, and causes of action of any kind or nature whatsoever held by, through, or on behalf of the Debtor and/or the Estate against any other Person, including but not limited to, all Avoidance Actions arising before the Effective Date and all Insurance Claims and Insurance Policies, if any, and which have not been resolved or disposed of prior to the Effective Date, are hereby preserved in full for the benefit of the Reorganized Debtor or to the Trustee of the Settlement Trust, as provided in the Plan. To the extent necessary, the Reorganized Debtor is hereby designated as the estate representative pursuant to and in accordance with Bankruptcy Code § 1123(b)(3)(B). Furthermore, in accordance with Bankruptcy Code § 1123(b)(3), after the

51

Effective Date, the Reorganized Debtor will own and retain, and may prosecute, enforce, compromise, settle, release, or otherwise dispose of, any and all claims, defenses, set offs, and recoupments belonging to the Debtor or the Estate. All defenses, counterclaims, claims, and demands related to any Tort Claims are preserved for the benefit of the Debtor and transferred to the Settlement Trustee and the Settlement Trust in accordance with Bankruptcy Code § 1123(b). On the Effective Date, to the extent necessary, the Reorganized Debtor is hereby designated as the estate representative pursuant to and in accordance with Bankruptcy Code § 1123(b)(3)(B) with respect to the Insurance Claims. For any other provisions relating to the reservation of rights and preservation of claims, demands and causes of action, reference is made to the Plan.

> **G.    Insurance Neutrality Provisions.**

Subject to Sections 18.5 and 18.6, nothing in the Plan or Confirmation Documents shall be construed to resolve in any way the Reorganized Debtor's claims or rights (either as assignee of any insurance proceeds payable to Debtor and/or Catholic Entities, in its own right or otherwise) against the Non-Settling Insurers, including, without limitation, any and all Insurance Claims and Contribution Actions. No provision of the Plan, the Plan Documents, the Release of Claims or the Confirmation Documents will in any way operate or be construed to release or impair, or have the effect of impairing or releasing, the Non-Settling Insurers' legal, equitable, or contractual rights relating to the Insurance Policies issued or allegedly issued by any Non-Settling Insurers. It is intended that the settlement provided for in the Plan with the Tort Claimants, including the Unknown Tort Claimants, shall inure to and for the benefit of the Settling Parties and shall not, directly or indirectly, inure to or for the benefit of any Non-Settling Insurers.

None of the Confirmation Documents or any order of the Court shall in any way operate to or have the effect of impairing the legal, equitable or contractual rights of any Non-Settling

Insurer that insured or is alleged to have insured a Non-Debtor, including its right to assert any Insurance Company Defenses, which rights are fully preserved. None of the Confirmation Documents shall be, or be binding as, *res judicata* or collateral estoppel, or constitute a trial or hearing on the merits or an adjudication or judgment as to any Tort Claim, Contribution Action, Insurance Claim, or assertion of Insurance Company Defenses against any Non-Settling Insurer. No order, determination, conclusion or finding made in the Reorganization Case, including the Confirmation Order, or any appeal therefrom, will be used, offered, cited or argued in or as to any Insurance Claim or Contribution Action against a Non-Settling Insurer, except to show that the letter and intent of the Plan is to preserve the Insurance Company Defenses and insurance neutrality as set forth in this Section 13.7 of the Plan, and to ensure preservation of rights and obligations set forth in Section 11.15 of the Plan.

None of the Confirmation Documents or any order of the Court, shall be binding, be *res judicata* or collateral estoppel, constitute a trial or hearing on the merits, or an adjudication or judgment, or be argued, cited or offered into evidence or used for any purpose to prove or show (including, without limitation proving or showing in or as to any Insurance Claim or Contribution Action or other litigation concerning an Insurance Policy or the obligations of any Non-Settling Insurer) against any Non-Settling Insurer:

(i) that the Confirmation Documents constitute a judgment, settlement or resolution of any Tort Claim;

(ii) that any Non-Settling Insurer participated in the negotiation of the Plan;

(iii) that any Non-Settling Insurer is liable for, or otherwise obligated to pay, with respect to any Tort Claim;

53

(iv) that any Non-Debtor (including Sacred Heart Cathedral), Reorganized Debtor or the Settlement Trust (including the Special Arbitrator or Settlement Trustee) or any other Person or Entity have satisfied any term or condition for payment from any Insurance Company, or whether any obligation of any Non-Settling Insurer has been triggered;

(v) that any Non-Debtor (including Sacred Heart Cathedral), Debtor, Reorganized Debtor, the Settlement Trust (including the Special Arbitrator and Settlement Trustee) or any other Person or Entity have suffered an insured loss or that the amount paid by the Non-Debtor (including Sacred Heart Cathedral) to the Debtor, Reorganized Debtor or the Settlement Trust in connection with any settlement or resolution of Tort Claims is reasonable or appropriate;

(vi) that the procedures and values established by the Plan and other Confirmation Documents, including the Matrix Protocol, for evaluating and paying the Tort Claims are (x) appropriate or reasonable, (y) consistent with any procedures to evaluate or settle Tort Claims before the Petition Date or (z) reasonable or consistent with any procedures used to evaluate or settle Tort Claims;

(vii) that the settlement of, Resolution for Payment of, or the value assigned to, any individual Tort Claim, pursuant to the Plan, including the Matrix Protocol, or by the Settlement Trustee or Special Arbitrator, is reasonable and/or otherwise appropriate, or relates in whole or in part to the liability of any Catholic Entity (including Sacred Heart Cathedral) other than the Debtor as opposed to the liability of the Debtor, Perpetrator or other Non-Debtor;

(viii) any Catholic Entity (including Sacred Heart Cathedral) other than the Debtor is liable for, or otherwise obligated to pay, with respect to any Tort Claim;

(ix) that the conduct of any Person or Entity in connection with the negotiation, development and/or implementation of the Plan and other Confirmation Documents is consistent with any requirement of any Insurance Policy or otherwise reasonable or appropriate; or

(x) that any tender of claims to a Non-Settling Insurer is appropriate or effective under applicable State law.

The determination or Resolution for Payment by the Special Arbitrator or Settlement Trustee with respect to a Tort Claim shall have no presumption, preclusive, *res judicata* or collateral estoppel effect against a Non-Settling Insurer.

If the Plan is argued, cited, offered or used in connection with any Insurance Claim, Contribution Action or other litigation concerning an Insurance Policy or obligations of a Non-Settling Insurer for any purpose not prohibited by this Section 13.7, only the relevant portions of the Plan shall be argued, cited, offered or used and the Plan shall have the status of a private contract with no judicial approval and the court or trier of fact shall be so advised.

The rights and obligations of the Debtor, the Settlement Trust (including the Special Arbitrator and Settlement Trustee), the Reorganized Debtor, the Non-Settling Insurers, and any Non-Debtor, any Contribution Action or other litigation pertaining to an Insurance Policy coverage or Non-Settling Insurer obligations shall be determined by a Court of competent jurisdiction under the Insurance Policies and applicable law.

The Debtor shall seek to include this Section in the Confirmation Order.

## H.    <u>Special Provisions Governing Unimpaired Claims.</u>

Except as otherwise provided in the Plan, nothing will affect the Debtor's or the Reorganized Debtor's rights and defenses with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to or setoffs or recoupments

against such Unimpaired Claims.

## I.     Operative Documents.

The Debtor will prepare any documents which the Debtor and the Reorganized Debtor deem are necessary or appropriate to execute and consummate the Plan or provided for under the Plan. If there is any dispute regarding the reasonableness or propriety of any such documents after reasonable and good faith efforts by the Debtor to negotiate and obtain approval of the documents by the other affected Person(s), any such dispute will be presented to the Bankruptcy Court for determination at or in conjunction with the Confirmation Hearing.

## J.     Administrative Claims Bar Date.

All requests for payment of administrative costs and expenses incurred prior to the Effective Date pursuant to Bankruptcy Code §§ 507(a)(2) and 503(b) shall be served and filed with the Bankruptcy Court no later than sixty (60) days after the Effective Date. Any such Claim which is not served and filed within this time period will be forever barred. Any claims for fees, costs, and expenses incurred by any Professional Persons after the Effective Date will be treated as part of the fees and expenses of the Reorganized Debtor or the Settlement Trust, as the case may be, and need not be submitted to the Bankruptcy Court for approval. After approval of the final fee applications of the Professional Persons by the Bankruptcy Court for services provided and costs incurred during the course of administration of the Reorganization Case and prior to the Effective Date, such Professional Persons will not be required to submit any further fee applications to the Bankruptcy Court in accordance with Bankruptcy Code § 330.

## K.     Delivery Of Distributions.

Distributions will be made by the Debtor or the Reorganized Debtor with respect to all Claims, other than Tort Claims, as follows:

(a)     At the addresses set forth in the proofs of Claim filed by holders of Claims (or the last known addresses of such holders if no proof of Claim is filed or if the Debtor or the Reorganized Debtor has not been notified of a change of address);

(b)     At the addresses set forth in written notices of address change delivered to the Debtor or the Reorganized Debtor after the date of any related proof of Claim;

(c) At the addresses reflected in the Schedules if no proof of Claim has been filed and the Debtor or the Reorganized Debtor has not received a written notice of change of address; or

(d) If any distribution to a holder of an Allowed Claim is returned as undeliverable, no further distributions to such holder will be made unless and until the Debtor or the Reorganized Debtor is notified of such holder's then-current address, at which time all missed distributions will be made to the holder without interest.

Distribution to Tort Claimants will be pursuant to the terms of the Litigation Trust Agreement or the Settlement Trust Agreement although the procedures may be similar or the same as the procedures set forth above.

All claims for undeliverable or uncashed distributions must be made on or before the first (1st) anniversary of the date applicable to such distribution, or with respect to the a final distribution to a Creditor holding an Allowed Claim, within ninety (90) days thereof. After such date, all such unclaimed property will revert to the Reorganized Debtor for further distribution in accordance with the Plan, and the Claim of any holder or successor to such holder with respect to such property will be discharged and forever barred, notwithstanding any federal or state escheat law to the contrary.

L.      **Limitation on De Minimis Payments.**

The Debtor or the Reorganized Debtor will make no distributions of less than $50 to any

57

Creditor holding an Allowed Claim. If a Creditor holding an Allowed Claim does not receive a distribution due to the provisions of this Section on any date on which is a distribution is to be made to Creditors in the same Class as the Creditor being entitled to such de minimis payment, then the Claim (so long as it is an Allowed Claim) will remain eligible for distributions on any subsequent distribution date, subject to the provisions of this Section. In all events, the Creditor holding an Allowed Claim which has not received a distribution on any previous distribution dates because of this provision, will receive such distribution on the date that final distribution is made to Creditors in the same Class as the Creditor being entitled to such de minimis payment.

**IX.    CONDITIONS TO EFFECTIVE DATE.**

   **A.    Conditions To Occurrence Of Effective Date.**

   Each of the following are conditions to the Effective Date, which conditions must be satisfied or waived by the Debtor and the Committee.

   (a)    The Confirmation Order has been entered by the Bankruptcy Court and has not been stayed;

   (b)    The Confirmation Order is in form and substance satisfactory to the Debtor, the Committee, Settling Insurers, and the Unknown Tort Claims Representative;

   (c)    All actions, documents, and agreements necessary to implement the Plan will have been effected or executed;

   (d)    The Bankruptcy Court shall have entered a Final Order approving all Insurance Settlements submitted to the Bankruptcy Court prior to the conclusion of the Confirmation Hearing.

   (e)    The funding of the Settlement Trust by the Diocese and the transfer of the Chancery property to the Settlement Trustee.

   **B.    Debtor's Obligations to Cause Effective Date to Occur.**

Upon satisfaction of the conditions to the Effective Date, the Reorganized Debtor shall pay or make provision for the prompt payment to holders of Allowed Claims to whom payments, pursuant to the Plan, are to be made on the Effective Date. The Reorganized Debtor will also make the transfers required to be made to the Settlement Trust unless such transfers have occurred prior to the Effective Date, and such transfers will be in full release and complete satisfaction and discharge of the Tort Claims.

### C.    Waiver Of Conditions.

The Debtor, in its sole discretion, may waive any of the conditions to the occurrence of the Effective Date including waiver of the Final Order condition any time from and after the Confirmation Date. In that event, the Debtor will be entitled to render any or all of its performance under the Plan prior to what otherwise would be the Effective Date if the above-referenced conditions were not waived, including, but not limited to, the right to perform under any circumstances which would moot any appeal, review, or other challenge of any kind to the Confirmation Order if the Confirmation Order is not stayed pending such appeal, review, or other challenge.

### D.    Effect of Non-occurrence of Conditions.

If the consummation of the Plan does not occur, the Plan will be null and void in all respects and nothing contained in the Plan or this Disclosure Statement will: (a) constitute a waiver or release of any Claims by or against the Debtor; (b) prejudice in any manner the rights of the Debtor; or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtor in any respect.

### E.    Merger; Choice of Law.

All obligations of the Debtor to all Claimants will be merged into the Plan and the documents executed by the Reorganized Debtor at Closing and delivered to the respective

affected Claimants. All such obligations of the Reorganized Debtor will be evidenced by the Plan and such executed and delivered documents. Unless otherwise provided therein, such documents will be governed by and construed in accordance with Iowa law.

F.    **Other Obligations of the Reorganized Debtor.**

The Reorganized Debtor will review all Claims other than Tort Claims filed against the estate and, if warranted, object to Claims within the time period provided in the Plan; and perform all of its obligations under the Plan Documents, including, without limitation, those obligations provided in the Settlement Trust Agreement and the Litigation Trust Agreement.

G.    **Modifications To Plan.**

The Plan may be modified by the Debtor or the Reorganized Debtor (as applicable) subject to and in accordance with the provisions and requirements of Bankruptcy Code § 1127.

X.    **EFFECT OF CONFIRMATION.**

A.    **Discharge.**

Except as otherwise expressly provided in the Plan or in the Confirmation Order and subject to Section 13.7 of the Plan, on the Effective Date the Debtor and Reorganized Debtor will be discharged from and its liability shall be extinguished completely in respect of any Claim including, without limitation, all Tort Claims and Unknown Tort Claims and debt, whether reduced to judgment or not, liquidated or unliquidated, contingent or noncontingent, asserted or unasserted, fixed or not, matured or unmatured, disputed or undisputed, legal or equitable, known or unknown, that arose from any agreement of the Debtor entered into or obligation of the Debtor incurred before the Confirmation Date, or from any conduct of the Debtor prior to the Confirmation Date, or that otherwise arose before the Confirmation Date, including, without limitation, all interest, if any, on any such Claims and debts, whether such interest accrued before or

after the date of commencement of the Reorganization Case, and including, without limitation, all

Claims and Debts based upon or arising out of Tort Claims, Relationship Tort Claims, Unknown

Tort Claims, and from any liability of the kind specified in Bankruptcy Code §§ 502(g), 502(h), and

502(i), whether or not a proof of claim is filed or is deemed filed under Bankruptcy Code § 501,

such Claim is Allowed under Bankruptcy Code § 502, or the holder of such Claim has accepted the

Plan. Notwithstanding the foregoing, (i) nothing in the Plan shall discharge any obligations of the

Debtor or Reorganized Debtor under the Settlement Agreement and such obligations shall survive

Confirmation of the Plan, and (ii) nothing in the Plan will impair, effect, or release the rights of any

Non-Settling Insurer with respect to any Tort Claims, including all Insurance Company Defenses.

### B.    <u>Vesting.</u>

Except as otherwise expressly provided in the Plan or in the Confirmation Order, on the

Effective Date the Reorganized Debtor shall be vested with all of the property of the Estate free

and clear of all Claims, Liens, encumbrances, charges and other interests of Creditors, and will

thereafter hold, use, dispose or otherwise deal with such property and operate its business free of

any restrictions imposed by the Bankruptcy Code or by the Court. All Avoidance Actions,

Contribution Actions and Insurance Policies are hereby preserved for the benefit of the

Reorganized Debtor. All Avoidance Actions are hereby preserved for the benefit of the Trustee

of the Settlement Trust. Prosecution and settlement of the Avoidance Actions, the Contribution

Actions in any Insurance Recoveries will be the exclusive responsibility of the Settlement

Trustee except as otherwise assigned. The Settlement Trustee will have sole and absolute

discretion over whether to prosecute or settle such causes of action.

### C.    <u>Exculpation And Limitation Of Liability.</u>

Neither the Debtor, the Reorganized Debtor, the Committee, the Unknown Claims

Representative, the Unknown Claims Representative, the Settling Insurers nor any of their respective present or former members, managers, officers, directors, employees, advisors, attorneys, or agents acting in such capacity (the "Released Parties") will have or incur any liability to, or be subject to any right of action by, any holder of a Claim or any other party in interest or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Reorganization Case, the pursuit of confirmation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct; and in all respects such parties will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan or in the context of the Reorganization Case.

**D.      Permanent Injunction Against Prosecution of Channeled Claims.**

Subject to Section 13.7 of the Plan and the assertion of Insurance Company Defenses, on and after the Effective Date and for the consideration described in the Plan and in Section 18.2, all Persons and Entities who have held or asserted, hold or assert, or may in the future hold or assert a Channeled Claim shall be permanently stayed, enjoined, and restrained from taking any action, directly or indirectly for the purposes of asserting, enforcing or attempting to assert of enforce any Channeled Claim, including: (a) commencing or continuing in any manner, any action or any other proceeding of any kind with respect to any Enjoined Claim or Channeled Claim against any Settling Parties or the property of the Settling Parties; (b) seeking the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree, or order against the Settling Parties or the property of the Settling Parties, with respect to any Enjoined Claim or Channeled Claim; (c) creating, perfecting, or enforcing any

encumbrance or lien of any kind against any Settling Parties or the property of any Settling

Parties with respect to any Enjoined Claim or Channeled Claim; (d) asserting any setoff, right of

subrogation, or recoupment of any kind against any obligation due to the Settling Parties with

respect to any Enjoined Claim or Channeled Claim; and (e) taking any act, in any manner and in

any place whatsoever, that does not conform to or comply with provisions of the Plan. In the

event any Person or Entity takes any action that is prohibited by, or is otherwise inconsistent

with the provisions of Section 18.4 of the Plan, the Plan or Confirmation Order, then, upon

notice to the Court by an affected Party, the action or proceeding in which the Claim of such

Person or Entity is asserted will automatically be transferred to the Bankruptcy Court or the U.S.

District Court for enforcement of the provisions of Section 18.4 of the Plan, the Plan or

Confirmation Order.

### E. Settling Insurer Injunction.

On and after the Effective Date and for the consideration described in the Plan and the

Insurance Settlements and Settlement Agreement, all Persons and Entities who have held or

asserted, hold or assert, or may in the future hold or assert an Enjoined Claim are hereby

permanently stayed, enjoined, and restrained from taking any action, directly or indirectly for the

purposes of asserting, enforcing or attempting to assert of enforce any Enjoined Claim,

including: (a) commencing or continuing in any manner, any action or any other proceeding of

any kind with respect to any Enjoined Claim against any Settling Insurer, and its respective

predecessors, successors, officials, shareholders, subsidiaries, parents, divisions, affiliates,

members, officers, directors, employees, representatives, attorneys, merged or acquired

companies or operations or assigns (collectively, the "Settling Insurer Parties") or the property of

the Insurer Parties; (b) seeking the enforcement, attachment, collection or recovery by any

manner or means of any judgment, award, decree, or order against the Insurer Parties or the property of the Insurer Parties, with respect to any Enjoined Claim; (c) creating, perfecting, or enforcing any encumbrance or lien of any kind against any Insurer Parties or the property of any Insurer Parties with respect to any Enjoined Claim; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due to the Insurer Parties with respect to any Enjoined Claim; and (e) taking any act, in any manner and in any place whatsoever, that does not conform to or comply with provisions of the Plan or Insurer Settlement Agreement. In the event any Person or Entity takes any action that is prohibited by, or is otherwise inconsistent with the provisions of Section 18.5 of the Plan, the Plan or Confirmation Order, then, upon notice to the Court by an affected Party, the action or proceeding in which the Claim of such Person or Entity is asserted will automatically be transferred to the Bankruptcy Court or the U.S. District Court for enforcement of the provisions of Section 18.5 of the Plan, the Plan or Confirmation Order.

The discharge and injunction provisions of the Plan are integral parts of the Plan.

**F. Insurer Conribution Claim Reduction.**

Notwithstanding Section 18.5, a Non-Settling Insurer may assert an Insurer Contribution Claim as a defense or counterclaim against the Reorganized Debtor (or other Person or Entity seeking coverage or Insurance Recoveries in any Contribution Action or Insurance Claim), and the Reorganized Debtor (or any other Person or Entity seeking coverage or Insurance Coverage) may assert the legal or equitable rights, if any, of the Settling Insurer in any such claim or action. In the event that a Non-Settling Insurer obtains a judicial determination or binding arbitration award that such Insurer Contribution Claims are valid, the liability (if any) of such Non-Settling Insurer to the Reorganized Debtor or any other Person or Entity shall be reduced by the amount of such Insurer Contribution Claims and no Settling Insurer shall be liable for any such Insurer Contribution Claims.

**G. No Release of Perpetrators.**

None of the provisions of this Plan, the Confirmation Order, or the Insurance Settlements or orders approving the Insurance Settlements with the Settling Insurers entered in this case affect the rights of a Tort Claimant to pursue a claim or recovery against a Perpetrator.

## XI.   **RETENTION OF JURISDICTION.**

Notwithstanding entry of the Confirmaion Order, the Bankruptcy Court will retain jurisdiction for the following purposes specifically described in the Plan which include, but are not limited to: (i) Allowing any Administrative Expense Claim; (ii) hearing and determining any objection to a Claim, except a Tort Claim; (iii) hearing and determining any Avoidance Action brought by the Debtor, the Reorganized Debtor, or the Settlement Trustee; (iv) hearing and determining all causes of action, controversies, disputes, or conflicts between or among the Debtor or Reorganized Debtor, the Settlement Trust, or any other party, including those pending prior to Confirmation, provided that this retention of jurisdiction does not pertain to any Insurance Claim or Contribution Action against a Non-Settling Insurer or any action concerning any Insurance Policy issued or alleged to have been issued to a Non-Debtor by a Non-Settling Insurer – the Court shall determine its jurisdiction over such matters if and when they are presented; (v) correcting any defect, curing any omission, or reconciling any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purpose and intent of the Plan; (vi) hearing and determining any actions brought by the Debtor or Reorganized Debtor to protect Debtor, the Estate, or Reorganized Debtor or Settling Party, or the Settlement Trustee to protect the Settlement Trust or a Settling Insurer to protect a Settling Insurer Party; (vii) issuing any order necessary to interpret, effectuate or implement the Plan or Confirmation Order, including, without limitation, such declaratory and injunctive orders as are appropriate to protect the Debtor, the Estate, the Reorganized Debtor, Catholic Entities, Settling Insurers or the Settlement Trust; (viii) hearing and

65

determining any dispute relating to the terms or implementation of the Plan, Confirmation Order, or the Settlement Trust, or to the rights or obligations of any parties in interest with respect thereto; (ix) authorizing the modification of the Plan after Confirmation pursuant to the Bankruptcy Code; (x) entering orders and decrees concluding and terminating the Case; (xi) determining any and all motions regarding assumption or rejection of Executory Contracts and any and all Claims arising therefrom; (xii) enforcing any of the provisions of the Plan and Settlement Trust; and (xiii) hearing and determining any motions brought by the Reorganized Debtor seeking approval of a proposed Insurance Settlement after the Effective Date pursuant to Bankruptcy Rule 9019 or such other provisions of the Bankruptcy Code or Bankruptcy rules as may be set forth in any such Settlement.

If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction or is otherwise without jurisdiction over any matter arising out of the Reorganization Case, the provisions regarding retention of jurisdiction by the Bankruptcy Court will not diminish, control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## XII.  GENERAL PROVISIONS.

### A.  Extension Of Payment Dates.

If any payment date falls due on any day which is not a Business Day, then such due date will be extended to the next Business Day.

### B.  Notices.

Any notice required or permitted to be provided under the Plan will be in writing and served by regular first class mail, overnight delivery, or hand-delivery.

### C.  Closing of the Case.

At such time as the Plan has been fully administered and/or the Plan has been substantially

consummated, the Reorganized Debtor will file an application for Final Decree. The Reorganized Debtor will file an application for Final Decree upon notice to only those Creditors, and parties that, after the Effective Date, have specifically requested such notice, after which an order approving the Reorganized Debtor's final report and closing the Reorganization Case may be entered.

**D.**     **Interest.**

Whenever interest is to be computed under the Plan, interest will be simple interest and not compounded.

**E.**     **Additional Assurances.**

The Debtor, the Reorganized Debtor, and the Creditors holding Claims herein will execute such other further documents as are necessary to implement any of the provisions of the Plan.

**F.**     **Confirmation By Nonacceptance Method.**

The Debtor has requested, as part of the Plan, confirmation of the Plan pursuant to Bankruptcy Code § 1129(b) with respect to any impaired Class of Claims which does not vote to accept the Plan.

**G.**     **Withdrawal or Amendment of Plan.**

The Plan may be withdrawn, amended or revoked prior to entry of the Confirmation Order.

**H.**     **Severability and Reformation.**

It is the Debtor's intention to comply fully with the Bankruptcy Code and applicable nonbankruptcy law in proposing the Plan. Therefore, if any provision of the Plan is determined by the Bankruptcy Court to be contrary to the Bankruptcy Code or applicable nonbankruptcy law, that provision will be deemed severed and automatically deleted from the Plan, if it cannot be reformed or the provision or its interpretation will be deemed reformed to ensure compliance; provided, however, that nothing contained in this Section will prevent the Debtor from

modifying the Plan in any manner whatsoever in accordance with and as set forth in the Plan. Pursuant to any ruling by the Bankruptcy Court regarding the subject matter of this Section, any such severance or reformation will be stated specifically in the Confirmation Order, which then will control notwithstanding any contrary or inconsistent provisions of the Plan.

### I.    Prohibition Against Prepayment Penalties.

If the Debtor or the Reorganized Debtor chooses, in its sole and absolute discretion, to prepay any obligation on which deferred payments are provided for under the Plan, the Debtor or the Reorganized Debtor will not be liable or subject to the assessment of any prepayment penalty thereon unless otherwise ordered by the Bankruptcy Court.

### J.    Fractional Dollars.

Notwithstanding any other provision of the Plan, no payments or distributions under the Plan of or on account of fractions of dollars will be made. When any payment or distribution of or on account of a fraction of a dollar to any holder of an Allowed Claim would otherwise be required, the actual payment or distribution made will reflect a rounding of such fraction to the nearest whole number (up or down).

### K.    Payment Of Statutory Fees And Filing of Quarterly Reports.

All fees payable pursuant to Section 1930 of Title 28 of the United States Code, 28 U.S.C. § 1930, as determined by the Bankruptcy Court at or in conjunction with the Confirmation Hearing, will be paid on or before the Effective Date and, thereafter, in accordance with applicable bankruptcy law. All quarterly reports of disbursements required to be filed by applicable bankruptcy law will be filed in accordance with applicable bankruptcy law.

### L.    Reservation of Rights.

Except as expressly provided in the Plan and this Disclosure Statement, the Plan will have

no force or effect unless the Confirmation Order is entered by the Bankruptcy Court and the

Effective Date has occurred. None of the filing of the Plan, any statement or provision contained in

the Plan or in this Disclosure Statement, or the taking of any action by the Debtor with respect to the

Plan will be or will be deemed to be an admission or waiver of any rights of the Debtor with respect

to the holders of Claims prior to the Effective Date.

**M.**    **No Professional Fees or Expenses.**

No professional fees or expenses will be paid by the Debtor or the Reorganized Debtor with

respect to any Claim except as specified in the Plan or as Allowed by Final Order of the Court.

**N.**    **Dissolution of Committee and Termination of Unknown Claim**

**Representative.**

Upon the occurrence of the Effective Date, the Committee shall be dissolved. The

Unknown Tort Claims Representative shall terminate on the Effective. Date.

**O.**    **Section 1146 Exemption.**

Pursuant to Bankruptcy Code § 1146(a), any transfers of property pursuant hereto will not

be subject to any document, recording tax, stamp tax, conveyance fee, intangibles or similar tax,

mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or

governmental assessment in the United States, and the confirmation Order will direct the

appropriate state or local governmental officials or agents to forgo the collection of any such tax or

governmental assessment and to accept for filing and recordation any of the foregoing instruments

or other documents without the payment of any such tax or governmental assessment.

**P.**    **Successors and Assigns.**

The rights, benefits and obligations of any Person named or referred to in the Plan will be

binding upon, and will insure to the benefit of, the heir, executor, administrator, successor or

assign of such Person.

## XIII.   POST-CONFIRMATION MANAGEMENT AND REORGANIZED DEBTOR.

### 1.   The Diocese.

The administration of the Reorganized Debtor will continue with the officers and directors currently holding those positions.

## XIV.   FEDERAL TAX CONSEQUENCES.

THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN. ACCORDINGLY, ALL HOLDERS OF CLAIMS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS WITH SPECIFIC REFERENCE TO THE FEDERAL, STATE, AND LOCAL TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO SUCH HOLDER. NEITHER THE DEBTOR NOR DEBTOR'S COUNSEL MAKES ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO THE DEBTOR OR ANY CREDITOR.

Under the Internal Revenue Code of 1986, as amended (the "Code"), there may be significant federal income tax issues arising under the Plan described in this Disclosure Statement that affect Creditors in the case.

The Settlement Trust is expected and intended to be a "qualified settlement fund" ("QSF") with in the meaning Treasury Regulations promulgated under Internal Revenue Code Section 486B(g). The Trust is characterized as a QSF because:

1.   The Trust is established pursuant to an order of, or is approved by, the United States, any state or political subdivision thereof, or any agency or instrumentality (including a court of law) of any of the foregoing and is subject to the continuing jurisdiction of that governmental authority;

2.   The Trust is established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event that has occurred and that has given rise to at least one claim asserting liability arising out of, among other things, a tort, breach of contract,

or violation of law (but excluding non-tort obligations of the Diocese to make payments to its general trade creditors or debt holders that relates to: a case under Title 11 of United States Code, a receivership, foreclosure of similar proceeding in a Federal or State court, or a workout); and

     3.     The Trust is a trust under state law. The primary tax consequences of the Trust being characterized as a QSF are the following:

1.     The Trust must use a calendar taxable year and the accrual method of accounting.

2.     If the Diocese funds the Trust with appreciated property, the Diocese is deemed to sell the property to the Trust. Accordingly, any gain or loss from the deemed sale must be reported by the Diocese.

3.     The Trust takes a fair market value basis in property contributed to it by the Diocese.

4.     The Trust's gross income less certain modifications is taxable at the highest federal tax rate applicable to trusts and estates (currently 35%). The Diocese's funding of the Trust with cash and other property is not reported by the Trust as taxable income. However, earnings recognized from, for example, the short-term investment of the Trust's funds will be subject to tax.

5.     The Trust may deduct from its gross income a limited number of administrative expenses; the Trust is not entitled to deduct distributions paid to its beneficiaries.

6.     The Trust will have a separate taxpayer identification number and will be required to file annual tax returns (which are due on March 15). The Trust will also be required to comply with a number of other administrative tax rules including filing information returns (generally IRS Form 1099) when approved payments are made to claimants. It is not practicable to present a detailed explanation of every possible federal income tax ramifications of the Plan.

71

## XV.  **ACCEPTANCE AND CONFIRMATION.**

### A.  **Voting Procedures.**

#### 1.  Generally.

Only those Classes that are impaired under the Plan are entitled to vote to accept or reject the Plan. The Diocese reserves the right to supplement this Disclosure Statement (if necessary) and to solicit any of those Classes which may prove to be impaired or unimpaired, as the Reorganization Case develops further.

Separate ballots will be sent to the known holders of Claims whether or not such Claims are disputed. The Court has been asked to estimate Tort Claims at $1.00 each for **voting purposes only**. In addition, only the holders of Allowed Claims (or Claims that have been temporarily allowed or have been estimated by the Bankruptcy Court) which are impaired are entitled to vote on the Plan. A Claim to which an objection has been filed is not an Allowed Claim unless and until the Bankruptcy Court rules on the objection and any appeals are determined, unless the Bankruptcy Court determines otherwise. The holders of such Disputed Claims are not entitled to vote on the Plan unless they request that the Bankruptcy Court, pursuant to Bankruptcy Rule 3018, temporarily allow the Claims in appropriate amounts solely for the purpose of enabling the holders of such Disputed Claims to vote on the Plan, and the Bankruptcy Court does so.

#### 2.  Incomplete Ballots.

Ballots which are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted as a vote either to accept or to reject the Plan or as a vote cast with respect to the Plan.

#### 3.  Submission Of Ballots.

The form of Ballot for each of the Classes entitled to vote on the Plan will be sent to all

Creditors along with a copy of the Court-approved Disclosure Statement and a copy of the Plan.

Creditors should read the Ballot carefully. The Bankruptcy Court has approved the form of

Ballot to be submitted to the holders of Tort Claims. Any Creditor having any questions

concerning voting procedures, it may contact:

> Richard A. Davidson, Esq.
> Lane & Waterman LLP
> 220 N. Main St., STE 600
> Davenport, IA 52801
> 563-324-3246
> rdavidson@l-wlaw.com
> Attorney for Diocese of Davenport

Ballot(s) must be returned to the above counsel for the Diocese. Ballots must be received

by the attorney for the Diocese no later than April 23, 2008 at 5:00 p.m. C.D.T. No faxed Ballots

will be accepted.

In addition, the Bankruptcy Court will hold a hearing on confirmation of the Plan

commencing on April 30, 2008 at 1:30 p.m. in Courtroom 140, United States Courthouse, 131 E.

4th St., Davenport, Iowa 52801. All objection(s), if any, to the confirmation of the Plan must be

in writing; must state with specificity the grounds for any such objections; and must be filed with

the Bankruptcy Court and served upon counsel for the Diocese at the following address on or

before April 23, 2008:

> Richard A. Davidson, Esq.
> Lane & Waterman LLP
> 220 N. Main Street, STE 600
> Davenport, IA 52801

**B.**    **Feasibility.**

The Bankruptcy Code requires, as a condition to confirmation, that the Bankruptcy Court

find that liquidation of the Diocese or the need for future reorganization is not likely to follow

after confirmation. For the purpose of determining whether the Plan meets this requirement, the

Reorganized Debtor's ability to meet its obligations under the Plan has been analyzed. As discussed previously, the Diocese has prepared projections for the Diocese's operations. The projections were prepared by Diocese Chief Financial Officer and are attached as Exhibit "H" to this Disclosure Statement. The Diocese reasonably believes that the Debtor will be able to fund the Plan on the Effective Date and the Reorganized Debtor will be able to make all payments required to be made pursuant to the Plan.

C.    **Best Interests Of Creditors And Liquidation Analysis.**

Under Bankruptcy Code § 1129(a)(7), the Plan must provide that Creditors receive as much or more under the Plan than they would receive in a Chapter 7 liquidation of the Diocese. This analysis is unusually hypothetical in this case, because, as a non-profit entity, the Diocese's Reorganization Case cannot be converted to a Chapter 7 without the Diocese's consent under 11 U.S.C. § 1112(c)(disallowing conversion of chapter 11 cases where the debtors is "not a moneyed corporation"). The Diocese submits that the best interest of creditors test in this context is akin to that of a Chapter 9 proceeding.

> While the best interests of the creditors test is an elusive standard in Chapter 9 nevertheless the concept is not without meaning.... The concept should be interpreted to mean that the plan must be better than the alternative that creditors have. In the chapter 9 context, the alternative is dismissal of the case, permitting every creditor to fend for itself in the race to obtain the mandamus remedy and to collect the proceeds.... [The courts] must apply the test to require a reasonable effort by the municipal debtor that is a better alternative to the creditors than dismissal of the case.

In re County of Orange, 191 B.R. 1005, 1020 (Bankr. C.D. Ca. 1996)(quoting 4 Collier on Bankruptcy, 943.03(7) (15th ed. 1995)(emphasis added by Judge Ryan). Accordingly, it is the Diocese's position that the best interest of creditors standard be applied to compare the Plan to the true alternative of dismissal and a race to the courthouse which greatly benefits the first to sue over the claims of others. Nevertheless in a hypothetical liquidation, the Diocese asserts that

74

all Creditors will receive more under the Plan than they would in a liquidation. In a liquidation, not only would the assets subject to restriction be in dispute, but the Catholic Entities and Settling Insurers would not voluntarily contribute without the corresponding benefit of the Permanent Injunction Against Prosecution of Channeled Claims and Settling Insurer Injunction.

Notwithstanding the position of the Diocese regarding the application of the best interests of creditors test to a non-profit entity such as the Diocese, attached hereto as Exhibit "I" is a liquidation analysis. As is evident from Exhibit "I", even under a traditional liquidation analysis, Creditors will receive not less under the Plan than they would receive in a hypothetical Chapter 7. The liquidation value is estimated to be less than $7,000,000 which is substantially less than all unsecured creditors, including Tort Claimants, will receive under the Plan.

D.    **Confirmation Over Dissenting Class.**

In the event that any impaired Class of Claims does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the request of the Diocese if all other requirements under Bankruptcy Code § 1129(a) are satisfied, and if, as to each impaired Class which has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such non-accepting Classes. Each of these requirements is discussed below.

1.    No unfair discrimination.

The Plan "does not discriminate unfairly" if: (a) the legal rights of a dissenting Class are treated in a manner that is consistent with the treatment of other Classes whose legal rights are similar to those of the dissenting Class; and (b) no Class receives payments in excess of those which it is legally entitled to receive for its Claims. The Diocese believes that under the Plan: (i) all Classes of impaired Claims are treated in a manner that is consistent with the treatment of other

75

similar Classes of Claims; and (ii) no Class of Claims will receive payments or property with an aggregate value greater than the aggregate of the Allowed Claims in such Class. Accordingly, the Diocese believes that the Plan does not discriminate unfairly as to any impaired Class of Claims.

        2.    <u>Fair and Equitable Test.</u>

The Bankruptcy Code establishes different "fair and equitable" tests for Secured Claims, Unsecured Claims, and holders of Equity Interests, as follows:

      (a) <u>Secured Creditors.</u> Either: (i) each impaired Secured Creditor retains its liens securing a Secured Claim and receives on account of its Secured Claim deferred cash payments having a present value equal to the amount of its Allowed Secured Claim; (ii) each impaired Secured Creditor realizes the "indubitable equivalent" of its Allowed Secured Claim; or (iii) the property securing the Claim is sold free and clear of liens with such liens to attach to the proceeds, and the liens against such proceeds are treated in accordance with clause (i) or (ii) of this subparagraph (a).

      (b) <u>Unsecured Creditors.</u> Each impaired unsecured Creditor receives or retains under the Plan property of a value equal to the amount of its Allowed Claim. There is no absolute priority rule issue in this case because there are no interests or junior creditors; or the holders of Claims and Equity Interests that are junior to the Claims of the non-accepting Class do not receive any property under the Plan on account of such Claims and Equity Interests.

      (c) <u>Equity Interests.</u> Either: (i) each holder will receive or retain under the Plan property of a value equal to or greater than (A) the fixed liquidation preference or redemption price, if any, of such interest or (B) the value of such interest; or (ii) the holders of interests that are junior to the non-accepting Class will not receive any property under the Plan.

The Diocese believes that the Plan satisfies the "fair and equitable" test with

respect to all impaired Classes. As with the best interests of creditors test, the fair and equitable

test is applied differently in the Reorganization Case than in most reorganization cases because

the Diocese is not a moneyed corporation. This is the case because the members of a non-profit,

in this case, the Bishop, have no personal interest in the property of the corporation.

Accordingly, there is effectively no equity interest in the Diocese. Accordingly, what is

commonly referred to as the "absolute priority rule" embodied by Bankruptcy Code §

1129(b)(2)(B) does not prevent the Diocese from continuing to operate.

## XVI.  **ALTERNATIVES TO THE PLAN.**

If the Plan is not confirmed, several different events could occur: (1) the Debtor could

propose another plan providing for different treatment of certain Creditors; or (2) the Bankruptcy

Court (after appropriate notice and hearing) could dismiss the Reorganization Case if the Debtor is

unable to confirm an alternative plan within a reasonable period of time.

## XVII. **RECOMMENDATIONS OF THE DEBTOR AND CONCLUSION.**

The Diocese and the Committee recommend that all Creditors vote to accept the Plan.

The Diocese and the Committee believe that the Plan provides the best possible return to

Creditors under the circumstances.


LANE & WATERMAN LLP            DIOCESE OF DAVENPORT

By: _____/s/ Richard A. Davidson_____     By: ___/s/ Charlene Maaske_____
    Attorney for Diocese of Davenport            Chief Financial Officer
    220 N. Main Street, Suite 600
    Davenport, IA 52801
    563-333-6624
    563-324-3246 Fax
    rdavidson@l-wlaw.com